### PEOPLE *v.* MUREL.

1. ASSAULT WITH INTENT TO MURDER—EVIDENCE—SUFFICIENCY.

    In a prosecution for assault with intent to commit the crime of murder, evidence *held*, sufficient to sustain conviction.

2. SAME—TRIAL—INSTRUCTIONS—SOLICITATION OF ANOTHER.

    Where the testimony on the part of the prosecution showed that defendant's participation in the assault went far beyond the mere solicitation of another to shoot, an instruction by the trial judge that it was not necessary that the defendant himself should have fired the gun, and so long as it was done at his request he would be equally guilty, *held*, proper.

3. WITNESSES—CONSTITUTIONAL LAW—WAIVER—OTHER OFFENSES—CREDIBILITY.

    Where defendant took the stand in his own behalf he waived his constitutional right and was subject to the same cross-examination as any other witness, and, for the purpose of testing his credibility, was required to answer any material question although it might tend to prove him guilty of another offense than that for which he was on trial.

On right to question defendant, who has taken the witness stand, concerning other crimes on cross-examination, see note in 62 L. R. A. 345.

Error to Genesee; Brennan (Fred W.), J.   Submitted October 24, 1923.   (Docket No. 155.)   Decided December 19, 1923.

Fred Murel was convicted of an assault with intent to commit murder and sentenced to imprisonment for not less than 20 nor more than 40 years in the State prison at Marquette.   Affirmed.

*F. L. Blackman,* for appellant.

*Andrew B. Dougherty,* Attorney General, and *Harry G. Gault,* Prosecuting Attorney, for the people.

STEERE, J.   Appellant was convicted of an assault with intent to commit the crime of murder upon a police officer of the city of Flint named Shirley Johnson.   The affair occurred early on the morning of Sunday, July 31, 1921, in front of police headquarters in said city.   Johnson had been on duty the night before and when relieved shortly before 5:30 in the morning returned to his home on West Court street. While on his way he noticed three men in a car driving out into Glenwood avenue.   When just entering his home he was accosted by these men who had stopped in front of it, with their car headed east, and one of them asked him the way to Lansing.   As he walked out to them he recognized the license number on their car as belonging to a car which had been reported to the officers at police headquarters as stolen before he went off duty that morning.   Two of the men in the car sat in front and defendant on the back seat, the space in front of him being filled up with a couple of suit cases, some baskets, etc.   Johnson then took custody of the car and men, whom he searched to ascertain if they were armed, took the rear seat with his feet hanging over the side and his revolver on his lap and ordered the driver to go to police headquarters with them.   On arriving there he directed him to

drive into the yard. The driver would not do so but swung up in front of the police station where Johnson ordered him to stop and said they would get out, starting to do so himself when, as Johnson testified, the driver struck him across the shins with something and defendant grabbed hold of his revolver, shouting as they struggled for its possession to the men on the front seat, "plug him—kill him—step on it." In the meantime the man in front on the right pulled a revolver from a pocket in the side of the car, quickly turned on his seat and said to Johnson, "You son of a b— let loose of that gun," and fired just as Johnson "ducked," the bullet going through the rim of Johnson's straw hat which was falling in front of him as he ducked. Johnson let go of his revolver, sprang clear of the car and "hollered" to the officer inside the station for help, or "for his gun," and the three men jumped from the car and ran. The motor of the car was then racing noisily.

The desk sergeant testified he was sitting at his desk with the switch board, answering calls, when he heard the motor racing, a shot and "somebody holler," and jumped to the window just as two of the men started to run. He turned back into another room, grabbed his gun and ran out when he saw the two men again going across the school grounds about a block away. He handed his gun and belt to Johnson, returned to his desk and summoned other officers to assist.

Search for the men was at once made by the police force, and two were captured, the third making good his escape. Defendant was apprehended about an hour and a half later by Johnson and another officer. During the search they drove out south in an automobile along the so-called Fenton road in sight of the railroad leading from the city in that direction and saw a man walking south along the railroad track with a shovel on his shoulder and coat on his arm.

Johnson recognized him as defendant and they drove ahead to a highway crossing of the railroad where they arrested him as he came along.

The first assignment of error argued in the brief of defendant's counsel is based on the contention that the record does not support the verdict.    To that point counsel quotes excerpts from the testimony, including claimed inconsistencies and contradictions in Johnson's testimony, and the story as a whole, which they assert—

"leads to the belief that the case against respondent was deliberately concocted by Johnson and that Johnson falsified in the particulars claimed by respondent."

The testimony is undisputed that those men were driving a recently stolen car freighted with various commodities, including a quantity of silk shirts, when arrested and that Johnson had such reasonable grounds to believe them guilty of a felony as to legally justify him in arresting them.    The owner of the car identified it, telling when and where it was stolen.    The men were armed.    Two revolvers were found in the car and there is testimony they had three.    Most of the circumstances leading up to and following the assault as testified to by Johnson are undisputed. Johnson and defendant are the only witnesses as to what took place at the time of the alleged assault. Defendant's version of it is that when they stopped at the police station and were about to get out Johnson pushed his gun against defendant's ribs which made him nervous and he grabbed it, and while he had hold of it the gun went off; that—

"He (Johnson) said 'don't shoot, don't shoot.'    I said 'leave go of the gun, leave go of the gun,' like that.    He had it up against my ribs.    I didn't know whether I was shot or not.    Just as soon as he jumped out of the car he left the gun in my hands.    I threw the gun away and started to run myself.    *    *    * When I grabbed the gun I said to the driver, 'step on

her, let's get out of here,' but he couldn't start the car —he got out and ran."

Johnson's revolver was found by another officer quite a distance from there near a temporary building on the school grounds where defendant subsequently admitted he threw it. What was said and done on that occasion by the four parties present and, particularly, what defendant's intent was as indicated by what he did and said, were clearly made issues of fact by the conflicting testimony.

In charging the jury the court explained the elements necessary to be shown by the prosecution to constitute the crime of which defendant was convicted, and also of the lesser assault offenses covered by the information, with proper instructions as to reasonable doubt and their duty in passing upon the facts submitted to them, saying amongst other things:

"It is not necessary that the respondent himself should have fired the gun. So long as it was done at his request, he would be equally guilty with the man who actually fired the gun, provided you find the element existed as I have stated and that beyond a reasonable doubt."

Error is assigned against this portion of the charge on the ground that mere solicitation is not in law sufficient to constitute the offense, quoting as a concise statement of the proposition the following excerpt from 30 C. J. p. 14, § 155:

"According to the weight of authority merely to solicit another to commit murder is not a sufficient overt act to constitute an attempt to murder."

To this may be added from the same authority:

"Of course if solicitation is accompanied by some overt act there can be no question as to its constituting an attempt but in such a case there is something more than mere solicitation." 16 C. J. p. 118, § 98.

Taking the testimony of Johnson as true, which was

for the jury, defendant's participation in this assault went far beyond mere solicitation. He was actively present, aiding, abetting and commanding in the team work of the three men which culminated in the felonious assault. The testimony shows that these three men were out on a plundering expedition well equipped with deadly weapons for the exigencies of offense or defense, but were caught off their guard by Johnson and did not find it opportune to take action while he was in an advantageous position watching them with his revolver in his hand. Their opportunity came, however, when instead of turning into the station yard as directed the driver stopped the car before the station in the street and Johnson started to get out first. Their action was prompt and concerted. The driver diverted Johnson's attention for an instant by striking him across the legs with something, defendant grabbed and held onto his gun in such manner that he could not use it, ordered those in front to "plug him—kill him—step on it," and each of them understanding his part promptly but unsuccessfully made overt effort to obey. Had their overt acts been as efficiently executed as that of defendant, it is not a far-fetched inference that Johnson would have been "plugged" and they safely clear of him and quickly away in their car at such speed as it was capable of. A bullet hole was found through the cushion on the back of the rear seat and the bullet sticking in the wood behind it. Whether it came from Johnson's gun or that of the man in the front seat was an issue of fact. Defendant testified he gave no directions to those in front to kill Johnson, that they did not shoot, and the only shot fired was from Johnson's own gun after he had grabbed it. Johnson testified that he did not and could not fire, as defendant so seized hold of his gun around the chamber that it could not be discharged, and demonstrated with it before the jury that it was possible to so grip and

hold it. Those issues of fact were submitted to the jury with proper instructions as to intent.

The remaining assignment urged is against claimed prejudicial cross-examination of defendant by the prosecuting attorney as to his previous arrests and confinement for various offenses, touching some of which dates, places and offenses were interrogatively stated in the questions asked. Some of those questions were answered in positive denial, some evasively and approximately half of them affirmatively. In support of the claim of prejudicial error defendant's counsel cites *Gale* v. *People,* 26 *Mich.* 157, 160, and *People* v. *Gotshall,* 123 Mich. 474.

When the *Gale Case* was tried the accused was not permitted to be sworn as a witness in his own behalf. He might if he wished make a statement and the prosecutor was at liberty to cross-examine him on the subject-matter of his statement. The opinion shows that the prosecutor made a display of several letters before the jury and apparently referring to them assumed the existence of matters entirely outside the scope of defendant's statement in relation to which he asked accusing questions. All such questions were timely objected to and the objections overruled. The court there said in part:

"In *People* v. *Thomas,* 9 Mich. 321, it was said by Mr. Justice CAMPBELL, that 'a cross-examination on such a statement would not be allowed to go beyond it. It could not properly extend over the entire issue, as it might if he were a general witness, neither could it go into any of the collateral inquiries whereby a witness' credit or memory is sometimes tested.' * * * And a review of the evidence in this case suggests very forcibly, that however full may be the explanations, a list of questions which assume the existence of damaging facts, may be put in such a manner, and with such persistency and show of proof, as to impress a jury that there must be something wrong even though the prisoner fully denies it."

The *Gotshall Case* was one depending entirely upon circumstantial evidence, some of which the opinion intimates was of doubtful value and unfairly presented. Against objection the prosecuting attorney persistently resorted to a line of accusing questions charging criminal conduct in the examination of both the defendant and certain of his witnesses, all of whom made emphatic denial. The court intimates this was carried beyond "reasonable bounds" and the manifest design was "not to elicit the facts but to cast suspicion upon the character and credibility of the witnesses," and that "the prosecuting attorney had no expectation that the respondent would admit he was guilty of arson in the several cases inquired about." For this and other reasons stated the conclusion was reached that "respondent did not have that fair and impartial trial which the Constitution and law of this State guarantee him."

In neither of those cases was anything done or said on the trial by the defense to invite or suggest that line of inquiry. The questions were all objected to when asked and all answered in denial. In this case defendant, as the statute now authorizes, took the stand and was sworn as a witness in his own behalf, and was subject to cross-examination as any other witness. He thereby waived his constitutional privilege to the extent that he was required to answer any material question although it might tend to prove him guilty of some other offense than the one he was on trial for. *People* v. *Dupounce,* 133 Mich. 1 (2 Ann. Cas. 246, 103 Am. St. Rep. 435) ; *People* v. *Prevost,* 219 Mich. 233. In his direct-examination his counsel went into the subject and asked him if he had ever been arrested and convicted, or pleaded guilty to any offense, to which he replied that he once pleaded guilty to simple larceny and got 90 days in the Detroit house of correction. He was then asked by his counsel and answered:

"*Q.* Have you ever been arrested and convicted of any other offense?

"*A.* No, sir."

On cross-examination he said that his right name was Webster and his home in Jackson, but admitted that when arrested in this case he told the officers his name was Murel and gave his residence at a fictitious number on Tennessee street in Detroit. He gave the names of the men arrested with him by Johnson in Flint as Freeland and Wells, admitted in answer to leading questions that he had been confined with them for three weeks in jail at Charleston, Ill., having been arrested in Toledo and taken to Charleston by officers who came after them, that they left the Charleston jail on July 9th, but he could not remember how they got out of there. He recognized Nichols as the name of a man in jail with them and the name of the jailer who had them in charge, but denied they got out of there by gagging him. Asked "How did you do it?" he replied, "Was some transaction in money probably that got us out of there." When the prosecutor sought for an explanation of how it was done with money he suffered another lapse of memory and dismissed the subject with the reply, "I said once I didn't remember, didn't I?" His statement on direct-examination that he had never but once been arrested and convicted being further pursued with suggestive questions as to time and place, he made direct denials as to some, evasive answers or said he did not remember as to some and admitted others. Following an answer that he did not remember he was asked, "You mean don't remember the times you have served in jail?" he replied, "I remember I have only been in jail three times in my life." Asked where that was he replied, "Mattoon, Flint and Toledo." Asked where Mattoon was and what he was in there for, he said it was in Illinois and he was in there "for being with somebody that stole a car." His memory being re-

freshed he conceded the addition of Jackson, Charleston and Detroit to his list.

The issue in this case turned on the conflicting testimony of Johnson and defendant, who were the only direct witnesses to the charged felonious assault.   As bearing on his credibility as a witness defendant's counsel had a right to and rigidly did cross-examine Johnson upon his past with accusing questions implying improper, unlawful and even criminal conduct as a man and officer.   In his direct-examination of defendant he, apparently for like purpose, absolved him from any criminal record, with one exception, and opened the door to that inquiry.   Defendant had voluntarily taken the stand as a witness in his own behalf, subject to like cross-examination as any other witness.

For like purpose—as bearing on his credibility—the prosecuting attorney had the right in cross-examination to ask him any material question although the answer might tend to show him guilty of some other offense than the one he was on trial for.   The trial judge of his own motion correctly instructed the jury as to the only purpose for which they could consider such testimony, and emphasized that any testimony tending to show defendant's criminal record could not be considered by them as evidence of his guilt under the charge in the case on trial.

No reversible error is found and the judgment will stand affirmed.

WIEST, C. J., and FELLOWS, McDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.