PEOPLE *v.* McKENNA.

1. CONSPIRACY—DEFINITION.

    To constitute a conspiracy there must exist an understanding or agreement to accomplish an unlawful end, or a lawful end by unlawful means.

2. SAME—EVIDENCE—DEFRAUDING STATE OF GASOLINE TAXES.

    Record in prosecution for conspiracy to defraud the secretary of State, and the State, containing evidence that defendant and another opened a bank account under fictitious name to procure gasoline distributor's license from secretary of State and attempted to do business after tanks were sealed under a tax warrant *held,* sufficient to sustain conviction of conspiracy to commit a crime (1 Comp. Laws 1929, § 3583; Act No. 328, § 505, Pub. Acts 1931).

Appeal from Recorder's Court of Detroit; Brennan (John V.), J.    Submitted October 14, 1937. (Docket No. 128, Calendar No. 39,615.)    Decided December 29, 1937.

Frank McKenna was convicted of conspiracy. Affirmed.

*Donald B. Frederick,* for appellant.

*Raymond W. Starr,* Attorney General, *Duncan C. McCrea,* Prosecuting Attorney, and *Gerald K. O'Brien* and *William L. Brunner,* Assistant Prosecuting Attorneys, for the people.

Bushnell, J.   James Howard, alias Albert Freemont, and Frank McKenna, also alias Albert Freemont, were charged with unlawfully, etc., conspiring with one Lillian Miller, alias Lillian Stearns, by false pretenses, etc., to cheat and defraud the secretary of State and the State of Michigan.   The information was laid under section 505 of the Michigan penal code, same being Act No. 328, Pub. Acts 1931. This section provides that ''any person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by any statute of this State, shall be guilty of a felony, punishable by,'' etc.

The information was filed October 30, 1934, and Howard and McKenna were brought to trial on May 15, 1935.   Because of McKenna's illness the trial was interrupted and before its completion Howard pleaded guilty.   His sentence was deferred and his name indorsed on the information.   When trial was resumed, Howard refused to testify and was committed for contempt of court.   The trial was adjourned to permit Howard to purge himself of

the contempt and, upon his continued refusal to testify, the case proceeded and McKenna was found guilty by a verdict of the jury.

The only error claimed by appellant is that the court should have granted defendant McKenna's motion for directed verdict of not guilty at the conclusion of the people's case. The record does not affirmatively show that such a motion was made but indicates that the jury was excused and that, during its absence, defendant's attorney made a motion. The record does not contain any testimony on the part of defendant McKenna and we assume that none was offered. Since the information does not detail any facts and the record does not contain the opening statement of the people, and no formal statement of facts is given in the people's brief, we are obliged to rely upon the statement in appellant's brief supplemented by the testimony found in the record. Thus reconstructed, the story of the alleged crime appears to be as follows:

The secretary of State, on October 17, 1933, received an application filed by one "Albert Freemont," claiming to do business as the Western Oil Company, in which he sought a license as a wholesale distributor of gasoline. This application was rejected because of similarity of names and another application was signed by "Freemont" and filed on November 8, 1933, in which he sought a license in the name of Western & Southern Oil Company. Included in the financial statement attached was the representation that the company had $5,000 in cash in banks. Subsequent applications were filed in the name of "Freemont," dated in the jurat as December 4, 1933, and January 19, 1934. As was customary, the secretary of State caused an investigation to be made which was conducted by Charles Webber,

an employee of his office. Webber had previously met Howard and McKenna in connection with another matter. Webber was informed by Howard that Freemont was a resident of Chicago and no further inquiry was made regarding the latter. In order to check the representation that $5,000 was on deposit in banks, Webber went to a branch bank with defendant McKenna who, Howard told him, was going to be a salesman for the company and was loaning it some money. An investigation at the bank disclosed only a part of the money on deposit, and a few days later McKenna came to Webber's office in Detroit and the two went to another bank, where McKenna deposited $5,000 in the name of Albert Freemont. The branch manager of the second bank testified that certain accounts were opened on November 6, 1933. We quote from his testimony:

"It was around 11 o'clock in the morning the Albert Freemont account was opened. The McKenna account was opened a couple of hours later.

"I saw the gentleman I thought was Albert Freemont later in the day, and he told me that he wished to open another account in the name of McKenna. I asked him who he was, and he said Frank McKenna. I don't recall his saying anything about Albert Freemont at that time, though I did recognize him as the same man I had met at 11 o'clock in the morning. I did not ask him any questions about the two different names.

"If I recall correctly the Frank McKenna account was opened partially from a transfer from the other account, and some additional cash. The Albert Freemont account was closed on December 19, 1933. The Frank McKenna account was closed November 9, 1933.

"The morning I met Mr. Freemont, Mr. Webber told me that he had to witness the fact that there

was $5,000 in a bank account before a license could be granted.

"I never knew any of these gentlemen before that date."

The Western & Southern Oil Company having failed to file proper reports and pay the full amount of the gasoline tax as required by the provision of Act No. 150, Pub. Acts 1927, 1 Comp. Laws 1929, § 3583, a tax warrant was issued by the secretary of State on February 7, 1934, covering the gasoline tax for the month of November of $6,144.48, December, $7,757.02, to which penalties and interest were added, making the total amount of the warrant $15,410.25.

On the same day, Edward A. Bilitzke, an enforcement officer in the secretary of State's office, a State trooper and three State auditors went to the company's place of business for the purpose of executing the warrant and seizing such property as could be found.

Early in January, the exact date not being definitely fixed in the record, having reason to believe that the oil company had received large quantities of gasoline on which no reports had been made or taxes paid, John C. Tompkins, then an investigator in the Detroit office of the secretary of State, was sent to the premises, where he claims he sealed the gasoline tanks and informed a woman in the company's employ that he was acting "under orders." The testimony of Joseph A. Schafer, who had been employed by Howard as a helper, shows that Miss Miller, presumably the party named in the information, gave him instructions in writing, to be delivered to Tompkins, regarding the sealing of the tanks. This written slip had printed on one side the words, "all but eight and three sealed;" on the reverse, "to Mr. Tompkins."

There were 13 storage tanks on the premises, and at this time, according to Schafer, all of them were empty excepting Nos. 3 and 8. Schafer claims that, "Tank 8 was never sealed, and tank 3 was unsealed by one of the boys working there." He said that about three days after Tompkins' visit, the seals were removed by someone and "the firm continued to use tanks 8 and 3 throughout January." Schafer never knew anyone by the name of "Albert Freemont," although he was asked by people where they could locate him. He said he acted on various occasions under orders from McKenna, Miss Miller and Howard, and a man named Rosenfield. The company operated five tank-trucks and a stake-body truck. Schafer said:

"The night before we left there I heard Mr. McKenna say something about not having to move the trucks, and Mr. Howard said that the trucks should be taken away. They hadn't finished operating the tanks when I left. The day I left I heard Mr. McKenna say to Mr. Howard, 'bring it out of there at night.'"

A notary public, who took the acknowledgment of "Albert Freemont" to the application dated December 4, 1933, identified someone in the court room as this man. The record fails to show whom the witness identified. One of the auditors of the secretary of State's office testified that, from an examination of the records seized and those obtained from the railroad companies, it appeared that from October 11, 1933, to February 5, 1934, 801,255 gallons of gasoline were delivered to the Western & Southern Oil Company and that the net amount of tax due was $21,219.54. Of the foregoing, 216,620 gallons were delivered during the month of January, of which 18,185 were reconsigned. The question before us is:

Should the trial court have granted defendant's motion for a directed verdict of not guilty?

We recently said in *People* v. *Tenerowicz,* 266 Mich. 276, at page 285:

"To constitute a conspiracy, there must exist an understanding or agreement to accomplish an unlawful end, or a lawful end by unlawful means. *People* v. *DiLaura,* 259 Mich. 260."

In the *Tenerowicz Case* there is considerable discussion of the nature of proof required in such instances and citation of many authorities. Defendant is justified in his argument that, "The circumstances relied upon by the people in the case at bar are meager indeed," but we do not agree with his contention that they are "so utterly lacking in probative force as to justify even an inference of appellant's guilt."

We think, on the contrary, that a case was made out by the people. No testimony was offered by the defendant. There is enough testimony in the record from which reasonable inferences may be drawn to sustain the jury's verdict of guilty of conspiracy to commit a crime. See *People* v. *Martin,* 235 Mich. 206, and *People* v. *Weyonen,* 247 Mich. 308. The court did not err in refusing to direct a verdict of not guilty.

The conviction is affirmed.

FEAD, C. J., and NORTH, WIEST, BUTZEL, SHARPE, POTTER, and CHANDLER, JJ., concurred.