## PEOPLE v. McCREA.

1. CRIMINAL LAW—CONSPIRACY TO OBSTRUCT JUSTICE—EVIDENCE—QUESTION FOR JURY.

In prosecution of former prosecuting attorney, certain other public officials and other persons on charge of conspiracy to obstruct justice by enabling the operation of houses of ill-fame, gambling rooms and devices, lotteries and other illegal enterprises, evidence educed from conspirators who pleaded guilty showing that defendant had received over $100,000 from collections made from such enterprises; that organization of prosecutor's office was such that names and addresses of persons operating such enterprises were turned over to chief investigator who occupied an office adjoining that of prosecutor and had been his close friend for many years; that defendant had twice declined to proceed with a grand-jury investigation of accusations against public officials in the county

and, although prior to taking office had not been in particularly good financial condition, had paid large sums of money in cash in payment of a mortgage and for stock and for other purposes, purchased a home in Florida and maintained a summer place in the north part of the State, was sufficient to present question of defendant's guilt to jury and to support its conviction of him on such charge, notwithstanding defendant took stand and denied participation.

2. SAME—JURY—CREDIBILITY OF WITNESSES.

In the prosecution of a criminal charge, the jury are the judges of the facts and are in a better position than an appellate court to determine the credibility of witnesses and weight to be given their testimony.

3. SAME—CONSPIRACY—EVIDENCE—VARIANCE.

Contention that evidence in prosecution of former prosecuting attorney, sheriff and others for conspiracy to obstruct justice did not support verdict of conviction because of alleged fatal variance between information charging one conspiracy and proofs claimed to have shown separate conspiracies centering in each office was without merit where evidence clearly established a connection between the prosecutor's office, the sheriff's office, and a single conspiracy to which the misconduct charged was all germane.

4. SAME—GRAND-JURY TESTIMONY—REFRESHING RECOLLECTION—IMPEACHMENT—ONE-MAN GRAND JURY—STENOGRAPHER—DUE PROCESS—EVIDENCE.

It was not reversible error nor a denial of due process for trial court in a prosecution for crime to permit the prosecution to use a transcript of grand-jury testimony for the purpose of refreshing the recollection of witnesses or for impeachment purposes and then to deny defendant the right to cross-examine witnesses concerning their grand-jury testimony, where the evidence of guilt is conclusive, since the defendant might have called either the judge or stenographer who participated in the one-man grand jury to testify whether or not the witnesses' testimony before the grand jury was different from that given by them at the trial (3 Comp. Laws 1929, §§ 17218, 17233).

5. SAME—MOTION TO QUASH INFORMATION—PRELIMINARY EXAMINATION—RECORD.

The Supreme Court is unable to say that motion to quash information in a criminal case. based on testimony taken at

preliminary examination, was erroneously denied, where testimony referred to does not appear in record.

6. SAME — PRELIMINARY    EXAMINATION — TRANSCRIPT — SUPREME COURT.

Order permitting appellant to withdraw transcript of testimony taken at preliminary examination from office of clerk of circuit court for the purpose of incorporating it in a supplemental printed record was not justified where appellant had stipulated that such testimony need not be printed because of the expense and difficulty involved and he had had several months to procure the filing of the transcript or a copy thereof in Supreme Court after clerk permitted examination in his office but refused to forward it to Supreme Court.

7. SAME—PROSECUTING ATTORNEY—DUE PROCESS—ONE-MAN GRAND JURY—OUSTER FROM OFFICE—PRELIMINARY EXAMINATION.

Due process of law was not denied defendant, a former prosecuting attorney, in prosecution for conspiracy to obstruct justice because circuit judge who had conducted one-man grand jury proceeding and had filed presentment with governor for defendant's removal from office also acted as examining magistrate at preliminary examination, as the fact that such judge had conducted the one-man grand-jury proceeding and sought defendant's removal from office did not disqualify him from exercising statutory power to hold preliminary examination and no prejudice or bias on his part was shown at preliminary examination, a proceeding not required by the due-process clause of either the Federal or State Constitution (U. S. Const. am. 14, § 1; Mich. Const. art. 2, § 16; 3 Comp. Laws 1929, §§ 17118, 17217, 17218).

8. CONSTITUTIONAL LAW—DUE PROCESS—PRELIMINARY EXAMINATION IN CRIMINAL CASES.

It is not a requirement of due process in criminal prosecutions that a preliminary examination be held (U. S. Const. am. 14, § 1; Mich. Const. art. 2, § 16).

9. CRIMINAL LAW—CONSPIRACY—ORDER OF PROOF—DISCRETION OF COURT—DUE PROCESS.

In prosecution of former prosecuting attorney, sheriff, and others for conspiracy to obstruct justice, in which there were more than 30 defendants and over 100 witnesses, record *held*, not to have disclosed an abuse of discretion amounting to a denial of due process of law on part of trial court because of order in which prosecution was permitted to put in proofs, the trial judge necessarily having a large discretion in such cases.

10. SAME—PREJUDICE.

In trial of former prosecuting attorney, sheriff, and others for conspiracy to obstruct justice, in which prosecuting attorney handled much of his own defense, reversible error because of aggressive manner in which case was conducted *held*, not to have resulted from alleged prejudicial questions that were asked nor from statements made which might better have been omitted.

11. SAME—CONDUCT OF COURT—PREJUDICE.

Court's restriction of defendant in prosecution for conspiracy to obstruct justice after his repeated attempts to question a witness as to her testimony before a grand jury by stating that court had already made a ruling on the matter, that there was no necessity of cumbering up the record and that defendant could "take it as far as you like" did not constitute reversible error as an intimation to the jury that defendant would be convicted.

12. SAME—CONSPIRACY—OTHER OFFENSES—EVIDENCE.

In prosecution for conspiracy to obstruct justice, testimony of one conspirator as to acts done in furtherance of the alleged conspiracy was admissible even though it also proved separate and distinct offenses.

13. SAME—CONSPIRACY—OTHER OFFENSES—EVIDENCE.

In prosecution of former prosecuting attorney and other county officials for conspiracy to obstruct justice by enabling the operation of houses of ill-fame, gambling rooms and devices, lotteries and other illegal enterprises, testimony of other like offenses was admissible for the purpose of proving a scheme, plan or system and where admission of such testimony was so limited by court and further restricted so as not to apply against defendants not then connected with the conspiracy it was properly received, since a conspiracy implies or connotes a plan (3 Comp. Laws 1929, § 17320).

14. SAME—CONSPIRACY TO OBSTRUCT JUSTICE—RES GESTAE—"PROTECTION" PAYMENTS.

Under information charging defendant, a former prosecuting attorney, and others with conspiracy to obstruct justice by enabling the operation of various illegal enterprises within the county, testimony of "protection" payments made by persons not charged as conspirators to parties who collected such funds in which defendants participated was admissible as part of the *res gestae*.

15. Same—Conspiracy—Evidence.

On trial of defendants charged with conspiracy to obstruct justice, all of the acts and facts upon which any reasonable presumption of the truth or falsity of the charge made against the defendants could be founded were admissible.

16. Same—Other Offenses—Evidence.

If proffered testimony tends to prove the offense charged, it is not incompetent because it also tends to prove the commission of another offense.

17. Same—Conspiracy—Self-Incrimination.

In prosecution for conspiracy to obstruct justice by enabling continuance of operation of various illegal enterprises, over-ruling of objection to question asked of a police officer as to whether a certain person had paid witness money was not reversible error, where witness refused to answer, standing on his constitutional right not to make self-incriminating answers (Const. 1908, art. 2, § 16).

18. Same—Requests to Charge—Instructions—Credibility—Accessories.

Failure to give specific request to charge in prosecution for conspiracy to obstruct justice that testimony of an accessory in a crime should be received with extreme caution and every possible motive for falsehood taken into consideration as affecting credibility was not error where court gave instructions fully and fairly covering question of credibility of all witnesses including the accessory.

19. Same—Comment on the Facts.

A judge is under no obligation to comment on the facts in a criminal case.

20. Same—Requests to Charge—Instructions.

The purpose of instructions is to enable the jury to determine more intelligently the facts from the evidence submitted and to apply the law thereto and where the instruction as given fairly covers the material substance embodied in the requests to charge, error may not be predicated upon refusal to give such requests.

21. Same—Request to Charge—Instructions—Character.

In prosecution for conspiracy to obstruct justice by enabling continuance of operation of various illegal enterprises, re-fusal to give request to charge that previous good character and reputation of defendant should stand in his favor when he took the stand and denied the accusations of an alleged

accessory, a self-confessed felon, whose testimony as against defendant stood unsupported and contradicted by other evidence, was not error, as such request was argumentative and attempted to focus the jury's attention on defendant's own assertion of previous good character and reputation as against his assertion as to the character of the accessory and charge as given fully and fairly instructed the jury on the question of weight to be given testimony as to defendant's previous good character.

22. SAME — CONSPIRACY — INSTRUCTIONS — REQUEST TO CHARGE — PRESUMPTIONS—BURDEN OF PROOF.

In prosecution of over 30 persons for conspiracy to obstruct justice by enabling the continuance of operation of various illegal enterprises, denial of request to charge by one defendant that if any one of the jurors should entertain a reasonable doubt as to the guilt of such defendant that he should vote for such defendant's acquittal and not yield simply because other jurors agreed or disagreed with him or her was proper where court ably and properly instructed jury as to presumption of innocence, prosecution's burden of proving guilt beyond a reasonable doubt, and existence and participation in conspiracy by any of the defendants.

23. SAME—PROSECUTING ATTORNEY—CONSPIRACY—INSTRUCTIONS— REQUEST TO CHARGE—RAIDS.

In prosecution of former prosecuting attorney and various other persons for conspiracy to obstruct justice by enabling the continuance of operation of certain illegal enterprises, denial of specific request to charge that statutes prescribed his duties as prosecutor and do not require him to make arrests, conduct raids or otherwise actively participate in the apprehension of law violators and that if he did so he would lose the immunity granted to a quasi-judicial officer was not error where instruction given fully instructed jury as to the powers and duties of prosecuting attorney and did not, as claimed by defendant, in effect charge that there was a duty on the part of the prosecuting attorney to conduct raids.

24. SAME—JURY'S UNAUTHORIZED EXAMINATION OF TRANSCRIPT OF TESTIMONY—MISTRIAL.

In prosecution for conspiracy to obstruct justice where jury, in the course of its deliberations, obtained three volumes of a transcript of the testimony and had them in its possession for about 10 minutes before they were retrieved by the court, failure of the court to grant a mistrial because of such hap-

pening was not error where jury did not examine any testimony except that which was later authenticated by stenographers who had reported the same, and later read to the jury in open court in the presence of defendants and their counsel and no prejudice to defendants appears to have resulted.

25. TRIAL—DELIBERATIONS OF JURY—PAPERS IN JURY ROOM.

Generally where a paper which should not properly be with the jury during their deliberations has been sent to the jury room through inadvertence or accident, and not through the connivance or design of the prevailing party, the verdict will not be set aside on that account if it does not appear that the paper was of a character to prejudice the unsuccessful party or that other circumstances rendered the reading of it harmful.

26. CRIMINAL LAW—INDORSEMENT OF WITNESSES—DISCRETION OF COURT.

Under code of criminal procedure, indorsement of names of witnesses after filing information is wholly within discretion of trial court, and party claiming abuse of discretion has burden of showing abuse (3 Comp. Laws 1929, § 17254).

27. SAME—INDORSEMENT OF WITNESSES—PREPARATION OF DEFENSE—FAIR TRIAL.

Exercise of court's discretion in permitting indorsement of names of witnesses after filing information must be with regard to protection of right of an accused to prepare his defense and to be accorded a fair trial and is to be reviewed upon the showing made and in view of the circumstances (3 Comp. Laws 1929, § 17254).

28. SAME — JURISDICTION — FAILURE TO INDORSE WITNESSES PROMPTLY.

Want of excuse or bad faith in failing to indorse names of witnesses on information promptly does not deprive court of jurisdiction to permit indorsement after filing information, but it casts upon prosecution burden of demonstrating that defendant will not be injured thereby, and that court is justified in permitting it (3 Comp. Laws 1929, § 17254).

29. SAME—INDORSEMENT OF WITNESSES—SUBSEQUENT INDORSEMENT.

In prosecution of over 30 defendants for conspiracy to obstruct justice where information contained a list of 125 witnesses, the prosecution's failure to have indorsed thereon the names of 17 other witnesses did not constitute reversible error where there is no satisfactory showing that such names were intentionally

omitted, 10 names were subsequently indorsed, certain of such witnesses examined and cross-examined and their testimony not shown to have been suppressed, and appellant herein failed to show that any of the other 7 witnesses would have given testimony in his defense and appellant declined court's offer to indorse names of other witnesses who, by examination or cross-examination, could be shown to be *res gestae* witnesses.

30. SAME—MISCARRIAGE OF JUSTICE.

No judgment shall be set aside or reversed or a new trial granted in a criminal case unless it affirmatively appears that the error complained of has resulted in a miscarriage of justice (3 Comp. Laws 1929, § 17354).

31. SAME—MISCARRIAGE OF JUSTICE—INDORSEMENT OF NAMES ON INFORMATION.

Where names of alleged *res gestae* witnesses were not indorsed on the information at the time it was filed, some were indorsed during the course of the trial on prosecution for conspiracy to obstruct justice and the witnesses examined and cross-examined and yet others not indorsed after court's offer to defendant to do so in case he showed they would give testimony in his defense was not accepted, defendant failed thereby to show an error in the trial resulting in a miscarriage of justice (3 Comp. Laws 1929, § 17354).

32. SAME—INDORSEMENT OF WITNESSES ON INFORMATION—ORDER OF PROOF—DISCRETION OF COURT.

Claim that defendant in prosecution for conspiracy to obstruct justice was prejudiced by order of prosecution's proofs resulting from alleged failure to indorse certain alleged *res gestae* witnesses on the information at the time of filing is without merit in the absence of a showing of an abuse of the discretion vested in the trial court as to the order of proof.

33. INDICTMENT AND INFORMATION—MOTION TO QUASH—PREJUDICE —ABUSE OF DISCRETION.

Denial of written motions to quash information in prosecution of over 30 defendants for conspiracy to obstruct justice because names of 17 persons alleged to be *res gestae* witnesses were not indorsed on information which did contain a list of over 125 witnesses was not reversible error where appellant failed to show prejudice resulting from fact that 10 names were later indorsed, the witnesses examined and cross-examined, defendant failed to show remaining witnesses would have given testimony in his defense and trial court's discretion as to order of proof was not shown to have been abused

in permitting testimony by some witnesses whose names were
not indorsed on information at time it was filed.

34. JURY—SELECTION—STATUTES.

Statute relative to selection of jurors for courts of record in
Wayne county in which it is required that jurors shall have
the qualifications of electors does not require that jurors
shall necessarily be selected only from a list of all the
qualified electors, hence method pursued by board of jury
commissioners in selecting jurors only from the list of regis-
tered voters was not in violation of such statute (3 Comp.
Laws 1929, § 13841).

35. SAME—CHALLENGE TO THE ARRAY—SELECTION—PREJUDICE—DUE
PROCESS.

Defendant in criminal prosecution who failed to show that
jurors selected from list of registered voters were prejudiced
against him or that the jury finally chosen failed to consider
question of his guilt or innocence in a fair and impartial
manner was not denied due process through action of board
of jury commissioners in selecting jurors only from registered
voters where statute required that jurors should have qualifica-
tions of electors, hence denial of motion challenging the ar-
ray. was not error (U. S. Const. am. 14; Mich. Const. art. 2,
§ 16; 3 Comp. Laws 1929, § 13841).

36. CRIMINAL LAW—SELECTION OF JURORS—CHALLENGE TO THE AR-
RAY—PROSECUTING ATTORNEY.

Motions and supplemental motions challenging array of jurors
and for new trial, made by defendant, a former prosecuting
attorney who had served in such office and as assistant prose-
cuting attorney for about 11 years and also as legal adviser
for the county board of jury commissioners in county where
prosecution was held were properly denied, where based on al-
leged newly-discovered evidence of irregularities in selection
of jury, in absence of showing of diligence in discovering
such alleged irregularities (3 Comp. Laws 1929, § 13841).

37. JURY—CHALLENGE TO THE ARRAY.

A challenge to the array, made after a verdict of guilty, comes
too late.

38. SAME—SELECTION—CHALLENGE TO ARRAY—WAIVER OF IRREGU-
LARITIES.

After a jury is impaneled and sworn, a mere unintentional ir-
regularity in the manner of selecting the jury which does not
prejudice a party may be said to have been waived.

39. CRIMINAL LAW—NEW TRIAL—SELECTION OF JURORS.

Claim by defendant in prosecution for conspiracy to obstruct justice, made in motion and supplemental motions for new trial and challenging array of jurors, that the board of jury commissioners selected too many jurors from certain sections and too few from other sections of the county did not warrant the granting of a new trial.

40. SAME—RELEVANCY OF QUESTIONS.

It is not competent to ask defendant who has voluntarily taken the stand as a witness in his own defense in a criminal case questions irrelevant to the issue having a tendency to bring in other charges but he may be asked what his conduct in connection with the accusation has been.

41. SAME—SELF-INCRIMINATION—WITNESSES—DEFENDANT AS WITNESS—WAIVER—CROSS-EXAMINATION—CREDIBILITY—COMMENT ON EVIDENCE.

A witness, subpoenaed to testify in a criminal trial, can stand upon his constitutional right and refuse to answer any questions which might tend to incriminate him but a defendant who voluntarily takes the stand in his own defense thereby waives such right and can be subjected to cross-examination concerning the facts in the case and as affecting his credibility and also makes comment upon his testimony entirely proper (Const. 1908, art. 2, § 16).

42. SAME—EXEMPTION FROM UNFAVORABLE COMMENT—WAIVER.

The statutory exemption from unfavorable comment is applicable only when the accused wholly refrains from testifying and if he goes upon the stand he waives such exemption and it is the same as though the statute had never been passed (3 Comp. Laws 1929, § 14218).

43. SAME—DEFENDANT AS WITNESS—CREDIBILITY—CROSS-EXAMINATION AS TO GRAND-JURY TESTIMONY.

In prosecution of defendant and others for conspiracy to obstruct justice where appellant took the witness stand and gave answers, not tending to incriminate him, to the same questions as had been asked him at a one-man grand-jury proceeding, it was not error for the trial court to permit the prosecution to cross-examine defendant regarding his grand-jury testimony which disclosed that he had there stood upon his constitutional rights and refused to testify (Const. 1908, art. 2, § 16).

Appeal from Wayne; Pugsley (Earl C.), J., presiding. Submitted June 11, 1942. (Docket No. 51, Calendar No. 41,712.) Decided November 24, 1942. Rehearing denied December 22, 1942. Certiorari denied by Supreme Court of the United States April 5, 1943.

Duncan C. McCrea was convicted of conspiracy to obstruct justice. Affirmed.

*Duncan C. McCrea, in pro. per.*

*Herbert J. Rushton,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *Thomas A. Kenney,* Assistant Attorney General, and *Chester P. O'Hara,* Special Prosecuting Attorney, for the people.

STARR, J.    Defendant Duncan C. McCrea and other defendants appeal from their conviction under the second count of an information charging a conspiracy to obstruct justice. In this opinion we consider only the appeal of defendant McCrea.

McCrea was elected at successive biennial elections and held the office of prosecuting attorney of Wayne county from January 1, 1935, until about September 13, 1940, when he was removed from office by executive order of the governor of the State in ouster proceedings (1 Comp. Laws 1929, § 3353 [Stat. Ann. § 6.696]).

The chain of events leading to the indictment, arrest, trial, and conviction of defendant McCrea and other defendants was started in August, 1939, by the suicide in Wayne county of one Janet McDonald who left letters, in effect, accusing public officials of corruption and graft. Such letters of accusation were given wide newspaper publicity and resulted in a demand for some official investigation of the charges made. At the time such letters were made

public in August, 1939, defendant McCrea was in Florida. One William E. Dowling, chief assistant prosecuting attorney, was then acting as prosecutor during McCrea's absence. Dowling promptly began an investigation of Janet McDonald's suicide and the accusations made in her letters. McCrea returned by plane from Florida and, according to the testimony of Dowling and other witnesses, ordered the investigation stopped. On August 17, 1939, the mayor of Detroit wrote to Assistant Prosecutor Dowling recommending that a "petition be filed before the proper tribunal requesting a grand-jury investigation." Dowling communicated with Mc-Crea, who was then in the Upper Peninsula, and informed him of the mayor's letter and recommendation. McCrea declined to request such grand-jury investigation and stated that he did not have "the facilities to conduct a thorough and complete investigation of all these charges and counter-charges."

Later in August, 1939, the circuit judges of Wayne county, sitting *en banc,* granted a private citizen's petition for a grand-jury investigation and designated Circuit Judge Homer Ferguson to act as a one-man grand jury (3 Comp. Laws 1929, § 17217 [Stat. Ann. § 28.943]). A special prosecutor was appointed who acted in co-operation with an assistant attorney general of the State. McCrea and other defendants, and also other persons, were called as witnesses before such grand jury. McCrea, when called as a witness, claimed his constitutional privilege against self-incrimination (Const. 1908, art. 2, § 16) and refused to testify in response to certain questions of the special prosecutor, on the ground that his answers might tend to incriminate him. As a result of the grand-jury investigation indictments were returned and warrants were issued against

McCrea and other defendants. The preliminary examinations were conducted before Judge Ferguson, and McCrea and other defendants were held for trial.

The second count of the information charged defendant McCrea as prosecuting attorney and certain public officials and persons therein named and also ''divers other persons'' with the common-law offense of a conspiracy to obstruct justice. Such information charged, in part, that McCrea and others:

''Knowingly conspired together · * * * wilfully and corruptly to assist and enable the keeping, maintaining or operating of houses of ill-fame * * * to assist and enable the keeping or maintaining of a gaming room or a gaming table or a game of skill or chance, * * * to-wit, handbooks, wherein bets were made upon horse races, * * * card games, and craps, * * * and to assist and enable the keeping or maintaining of * * * slot machines * * * and to assist and enable the setting up or promotion or management * * * of a certain lottery or gift enterprise for money, to-wit, the Red Horse Mutuels, the Lucky Tiger Mutuels and the Northwestern Mutuels, all being in violation of the laws of the State of Michigan; and to procure the wilful, intentional and corrupt failure, omission and neglect on the part of said * * * McCrea (and other officials) in their respective official and public offices * * * to perform their respective official duties as public officials of said county * * * in the enforcement of the criminal laws of this State * * * relating to prostitution, gambling and lotteries; and as a result of said agreement and conspiracy certain houses of ill-fame * * * were permitted to be kept, maintained or operated at various places in said county * * * and as a further result of such agreement and conspiracy the keeping or maintaining of a gaming room or gaming table or a game of skill or chance or

partly of skill and partly of chance, used for gaming, for hire, gain or reward, to-wit, handbooks, wherein bets were made upon horse races, * * * card games, and craps, were permitted to be kept, maintained and operated at various places in said county * * * and as a further result of such agreement and conspiracy, certain games of skill or chance, or, partly of skill and partly of chance, used for gaming, namely slot machines, were kept or maintained for hire, gain or reward, in said county, * * * and as a further result of such agreement and conspiracy a certain lottery or gift enterprise for money was set up, promoted or managed within the State of Michigan and county of Wayne, to-wit, the Red Horse Mutuels, the Lucky Tiger Mutuels and the Northwestern Mutuels * * * and certain money was paid by the keepers of these houses, the operators of said gambling rooms, games and devices, and the operators of said lotteries, or by their agents or employees to the foregoing public officials as a consideration for this agreement, and certain gifts and gratuities were presented by them to the said defendant public officials as a consideration for this agreement and accepted by the latter; he, the said * * * Duncan C. McCrea, as such prosecuting attorney, * * * being then and there enjoined by law with the duty of enforcing all criminal laws of the State of Michigan, including the laws pertaining to the keeping, maintaining or operating of houses of ill-fame, the keeping or maintaining of gambling rooms or gambling games or devices, and the setting up or promotion, operation, or management of lotteries and gift enterprises for money.''

The trial of McCrea and other defendants charged as co-conspirators began about January 8, 1941, and with various interruptions continued for over three months. At the conclusion of the people's proofs the trial court discharged seven of the defendants. McCrea took the stand and testified in his own de-

fense. At the conclusion of all proofs the prosecu-
tion stated its election to go to the jury on the
second count of the information, and the first count
was accordingly dismissed by the trial court. The
jury acquitted defendant Noceri and found McCrea
and all other defendants (except Angelo Scaduto)
guilty as charged. Scaduto, having waived jury
trial, was found guilty by the court. McCrea was
sentenced for a period of 4½ to 5 years and fined
$2,000. His motion and supplementary motions for
a new trial were denied, and, having obtained leave,
he appeals.

McCrea contends that the evidence presented does
not support the jury's verdict. Under this conten-
tion he first argues that the verdict was against the
great weight of the evidence. We have carefully re-
viewed the voluminous record and shall briefly dis-
cuss certain portions of the testimony pertinent to
this and other contentions by McCrea.

Soon after taking office in January, 1935, McCrea
appointed one Harry Colburn as chief investigator
of the prosecutor's office. Colburn had been a close
friend of McCrea for many years. He had no ex-
perience in law enforcement work. Prior to his
appointment he had been engaged in the wholesale
fish business and also in the tailor business. During
the course of the trial Colburn, who was charged as
a defendant and conspirator, pleaded guilty and
thereafter testified as a witness for the prosecution.
His testimony being important, we quote at some
length therefrom:

"I had conferences with the defendant Duncan C.
McCrea with reference to the possibility of collec-
tions for such (illegal) enterprises in this county.
It was shortly, almost immediately after I became
chief investigator, that Mr. McCrea told me that if
we were smart we could make some money together

and not get hurt. He, on that occasion, explained to me how this money could be made by collecting from these illegal enterprises and being careful not to promise too much. At that particular time nothing much was said with reference to who, if anybody, should make these collections. It was left for granted that I was going to do it. I suppose after I made one attempt which resulted in failure I suggested getting someone we could trust to handle it because I didn't feel that I wanted to do it myself. I made the suggestion to Duncan C. McCrea. He thought that was all right providing the man I got could be depended upon and he wouldn't get us into trouble.

"Then I engaged Sam Block to handle these collections on a commission basis. He was to receive 10 per cent. for his services in making these collections from these illegal enterprises.

"I did convey to Mr. McCrea knowledge of the fact that Sam Block was going to act as collector on a 10 per cent. basis. I do not remember any particular conversation that Mr. McCrea offered except that in general if I was sure that I knew this fellow and that he was trustworthy and wouldn't get out of line, or words to that effect.  *  *  *

"I did have a conversation with Sam Block about how this should be done. An agreement was reached, he was to contact various people in these illegal enterprises.  *  *  *

"Mr. Block did collect money from these illegal enterprises throughout Wayne county and paid to me money which he had collected from these various illegal places.  *  *  *

"I would receive this money from Block once each month. Block would pay me this money at some place that we had planned to meet. He paid me on the second floor of the Broadway Market a few times, and at other times I met him in an automobile and places of that sort.

"I did discuss with McCrea the pro rata division of this money to be collected by Block as to how much

each one should receive. It was sort of a mutual understanding at the time.

"Block was to get 10 per cent. off [of] the total amount. I was to retain 33⅓ per cent. for myself, and the balance went to Mr. McCrea. Mr. McCrea received his pro rata share each month regularly, as often as I got it. I paid Mr. McCrea his share of these collections from these illegal places or persons in cash, generally, in his office. As an example, take the sum of $1,000. If Block handled $1,000, he deducted his 10 per cent. before turning the money over to me. That would be $100 for Block out of the $1,000. I would then divide the money, and keep $300 for myself and turn over $600 to McCrea. Mr. McCrea never refused to take any part of this money that I tendered him each month. * * * This continued until August, 1939, until about the time the grand jury came into existence. * * *

"Over the entire period I received slightly better than $52,000. I always figured it was one-third of the net balance, and in figuring the totals that means Mr. McCrea received 60 per cent. of the gross, so that if I received $52,000 he would receive twice as much. * * * I did personally pay to Mr. McCrea over this same period of time better than $100,000 in cash as his portion and pro rata of the collections that came from these illegal places in Wayne county, and he accepted them, that amount of money."

Sam Block, who had been engaged by Colburn to do the collecting from houses of prostitution, gambling places, and other illegal businesses, testified as a witness for the prosecution. Block had operated a handbook and gambling business prior to 1935 and continued such business until sometime in 1939. Block had known Colburn for many years, and in the summer of 1935 went to Colburn's house at his request. Block testified, in part:

"We (Colburn and Block) discussed making some money from the different enterprises that were

operating in the county, handbooks and illegal enterprises. * * * We discussed the different things that operated in the county and said that we might be interested in making some money, and I told him I would contact these different people and see what I could collect from them. I discussed handbooks at that time and anything that operated in the county that was illegal. I guess there were some disorderly houses, known as houses of ill-fame or houses of prostitution. I believe we discussed at that time policy and numbers. We didn't go into detail as to what was operating, because I said I would collect whatever I possibly could contact and see what collections could be made. That was left to me. * * *

"During all of the period that I was collecting in the interim between the time I started in 1935 and the time I suspended in August of 1939, I contacted Harry Colburn monthly. On every one of these occasions that I contacted him, I gave him the moneys that I collected, less my commission of 10 per cent."

Block testified in detail as to the collections he made directly or indirectly from illegal businesses in Wayne county. In some instances he collected directly from the operators. In other cases collections were made by some person whom Block designated as collector for a particular district or part of the county and the money was turned over to Block. In certain instances money was collected by one Gustave Pines or by others who claimed that they were collecting for the sheriff's office and that they paid Block his agreed share of such collections. In making collections from these illegal businesses, Block apparently made few, if any, promises of protection from the prosecutor's office. He testified: "I promised them nothing." Block also testified that he never "had any business dealings" with McCrea. However, there was testimony that Block

PEOPLE v. McCREA. 231

told certain operators that he was from the prosecutor's office, and told others that he was collecting for the prosecutor's office. It may reasonably be inferred that Block or his representatives were able to collect from these illegal businesses only because of express or implied threats of prosecution if the money was not paid. It is also a reasonable inference that the operators paid Block or his representatives for the intended purpose of obtaining protection against prosecution.

It is unnecessary to narrate the testimony of the owners or operators of these illegal businesses as to payments they made to Block or others for him. Suffice it to say that many such operators testified in detail as to their interviews with Block or his representatives and as to the amounts of money they paid from month to month for protection. Their testimony was positive and uncontradicted. Such payments ranged in amount from $25 a month from a small gambling place to $900 or more a month from a house of prostitution operated by co-defendant Bertha Malone, alias Bertha Johnson. Block testified further:

"I would say I was turning in between four and five thousand a month to Colburn. None of that money came from any legitimate enterprise that I know of. It all came in from houses of prostitution, handbooks, or other gambling devices. I never knew of the prosecutor's office raiding these places during the time I was making these collections, after I started making the collections. * * *

"I usually gave Colburn a slip with the money collected from all of the various enterprises that I told him about. That slip showed the different places that I collected from. * * * I would give him such a slip each month together with the money that I turned over to him. * * *

"My best recollection as to the highest amount I turned in from these illegal spots in any one month during that four-year period when I was collecting is probably between $7,000 and $8,000. The figures I gave you yesterday were the average when I said $4,000 to $5,000. That was the average monthly payment."

In summary, the testimony stands undisputed that Colburn had an agreement with Block to make the graft collections from illegal businesses; that Block made such collections and turned the money, less his 10 per cent. commission, over to Colburn. Colburn says, in substance, that defendant McCrea approved such agreement with Block and that the whole scheme of collecting protection money from illegal businesses was carried out in pursuance of his arrangement made with McCrea in 1935. Colburn admits he received the collections from Block and states that he retained one-third and paid two-thirds, "better than $100,000" to McCrea. McCrea emphatically denied any such arrangement with Colburn and denied receiving any money from Colburn. He testified, in part:

"I never had any agreement with Colburn, Block or anyone else to collect illegal money or violate the law. I never discussed such a thing with Colburn."

The testimony of Colburn and McCrea was in direct conflict. It is undisputed that Block collected large sums of money and paid the same, less his commission, to Colburn. What became of such money? If McCrea is to be believed, then all of such money was retained by Colburn, Block, or others. If Colburn is to be believed, then McCrea received the major portion of the money.

We shall briefly discuss other testimony which the jury may well have considered in determining the

credibility and weight to be given the statements of Colburn and McCrea. The testimony of Block and Pines as to their collections from illegal businesses, and the testimony of the owners and operators of many of such businesses as to the money they paid, certainly created a background of evidence giving at least some credibility to Colburn's testimony that McCrea was an active and willing participant in the graft collections.

After taking office in 1935 McCrea, through his investigators, obtained the names and addresses of persons engaged in conducting houses of prostitution, bookie, gambling and other illegal businesses. His investigators, who obtained such names and addresses, testified that they were instructed to turn such information over to Colburn as chief investigator. Colburn made a deal with Block to collect from illegal businesses in the county. It is significant that the prosecutor's office apparently did not interfere with Block's personal bookie and gambling business during the several years he was acting as collector for Colburn. The evidence indicates few raids on or interference with illegal businesses that were paying Block. There was evidence indicating that certain places had been tipped off and as a result were found to be closed when raided. A chief of police of the city of River Rouge testified, in part:

"I had received complaints from the prosecutor's office to investigate some particular address that I knew was running prior to the time I got the complaint. Then when I would get the complaint, and went down to investigate, I did not find anything in operation."

A chief of police of the city of Hamtramck, who had paid $1,500 to obtain his appointment, testified, in part:

"On that occasion in April Figurski (alias Ferguson, who was convicted as a co-conspirator) stated that all the disorderly houses and gambling places had opened up on the 1st of April; that matters had been straightened out with the prosecutor's office and the sheriff's office.  *   *   *

"Those places remained open until about the time the grand jury came into session in August, 1939."

One Perry who operated a handbook or gambling business in the county refused to pay Block. Colburn testified regarding the Perry incident, in part, as follows: "I informed Block that I would send out complaints and see that the fellow (Perry) was either put out of business or harassed to the extent that he would fall in line." On complaint of the prosecutor's office Perry's gambling place was raided and he was instructed to report to the sheriff's office. Perry testified, in part:

"I did come downtown the next day with Mr. Moxson. We went to the sheriff's office, before (undersheriff) Mr. McGrath. We had a talk with McGrath. He told us that I was doing a lot of popping off down there, and I was going across the street and see the prosecutor.  *   *   *

"I then accompanied McGrath across the street. We went to Mr. Colburn's office.  *   *   *

"He (Colburn) asked if I said I was going to blow the top off the County Building.  *   *   *

"So finally Mr. Colburn says to me, 'You are going in to see Mr. McCrea.' I went in to see Mr. McCrea. Mr. McCrea's office was next to the office in which I was talking to Colburn. McCrea was there; also Mr. Moxson, Mr. McDermott, Mr. McGrath, Mr. Roberts and Mr. Colburn. Mr. McCrea became very angry.

"He started telling me I was not a fit man to be running a handbook, and the likes of me made it tough for the good gamblers. And he went on and

he told me, he says, 'You dirty  *  *  *  you will never run a book in Wayne county.' And finally he told the officers to take me down and get ·a warrant for having gambling equipment in my possession.''

Perry's testimony as to his interview with McCrea was verified by other witnesses who were present at such interview. It was later arranged that Perry might reopen his gambling place by making payments to Pines and Block.

One Bernard Boggio was chief assistant prosecutor under McCrea from January 1, 1935, to January 1, 1938. Boggio testified that he informed McCrea of a rumor that Sam Block was collecting money from illegal places and paying Colburn, and that McCrea said:

· '' 'Barney, you are always sticking your nose in this gambling business.' He says, 'You know me. You have known me for a long time, and you know I wouldn't take a cent, not a dime. You know Harry Colburn wouldn't take it unless I let him take it. Why don't you drop the whole matter? We aren't taking a dime, and nobody is going to hurt us.' ''

Boggio testified further that when he told McCrea that the prosecutor could ''put a stop to anything in this town if he wants to,'' McCrea replied:

'' '*Well, I can keep my goods clean.* I have invented or brought about a new practice; I have a three-sheet complaint form,' he says, 'in which I can handle all this business without. hurting myself. And this complaint form,' he said, 'will take care of every complaint in this county, and when a man comes in to me, or some woman writes a letter in here, as is often done, that her husband is out losing his money in a crap game or some joint, I send this complaint to the proper police official. · If it is Hamtramck, or Dearborn, or Grosse Pointe, or Detroit, wherever it is, and then I ask him to make an investi-

gation, and ask him to report back to me. So, this complaint goes out in duplicate to these various law-enforcement agencies, and you know very well, Barney,' he says, 'they will send a policeman out there to look at it.' At that point he just said a policeman, and he says, 'You know very well when this policeman goes in this place in uniform, that *he will be able to see no gambling going on.* They are all going to be very quiet. In the first place, he probably won't be able to get in, and the report will come back there is no gambling going on. I will show the report to whoever made the complaint, and this man will say, "Well, it must be the police are on the take again. I have always suspected it." ' I (Boggio) says, 'Well, Mac (McCrea), I don't like it at all.' I says, 'Some day you are going to be hung by your own new system you invented.' He considered it foolproof, that nobody could ever bring home to him any gambling situation because he had done his duty.''

In 1936 Boggio attempted to collect election campaign funds for McCrea from certain gamblers. He testified that McCrea called him to his office and said:

" 'Damn you, Barney (Boggio), I have told you many times I didn't want you to monkey around with those gamblers. You leave that to me. If you want any money I will get it for you. Harry Colburn will arrange for all the money you need for the campaign.' So, we said O. K. The next morning, McCrea threw $1,000 on my desk and said the touch I made worked because Watson brought in that money for the campaign. McCrea said if you want more money see me or Colburn, and not to go out on my own hook again. Colburn gave me money after that and said it came from number operators. * * * Colburn asked me to give breaks to people arrested for gambling. * * *

"I talked with McCrea about Colburn's expenditures.  *  *  *  Colburn was living as a man would live who had a salary of $10,000, $15,000, or $20,000 a year.  *  *  *  I also told Harry, I says, 'How do you do that all on $3,200 a year?'  *  *  *  I once brought the subject to McCrea—perhaps more than once. He (McCrea) said, 'Barney, don't kid yourself. Harry (Colburn) isn't spending much money. *He is getting a few thousand dollars extra from me,* and he is living on his salary.' I know what Colburn's financial condition was immediately prior to the time he came into the office; *he was flat broke.*"

Colburn testified further, in substance, that during the trial McCrea came to his home and attempted to induce him to feign sickness and remain in bed to avoid testifying, and that McCrea said:

" 'You have got to do it. It is the only thing that will save you.'

"I said, 'What am I supposed to do when these doctors that the court sends out come to examine me?' He (McCrea) said, 'You lay in bed, and you got pains in your back, and you got pounding in your head, and you don't know what you are talking about, and if they become insistent, you get up and pound the wall with your hands, tear your hair out, tell them you don't know what they are talking about at all, that you get dizzy spells, that you can't stand up, and you fell on the floor, and you carry on in general.'

"I said, 'How long can I keep that up?'

"He says, 'As long as it is necessary. Months, six months, or a year.' He says, 'You will have a better chance later on than you will have now.' "

McCrea denied the above-quoted testimony of Colburn and Boggio.

There was some testimony indicating that McCrea was not in particularly good financial condition at the time he took office January 1, 1935. His salary

as prosecutor was $9,600 a year. It appears that within the next year or two he paid a mortgage of $8,000 on his home. McCrea said: "I paid it with a cashier's check I bought with cash. I took the cash out of my box, my safe deposit box." In April, 1936, McCrea bought 5,000 shares of Federal Asphalt Corporation stock at $1 a share and paid cash for it. He later purchased a home in Florida. He maintained a summer place in northern Michigan. In 1939 he personally paid Colburn $2,000 in addition to Colburn's salary.

There was also testimony indicating that at about the time the grand-jury investigation was started, McCrea removed certain papers including "warrant refusals for gambling" out of the prosecutor's office and placed them in a safety deposit vault. We do not overlook the fact that McCrea as prosecutor declined to proceed with a grand-jury investigation of the accusations against public officials in 1939 and apparently ordered Assistant Prosecutor Dowling to stop his investigation of such accusations.

The conflicting testimony of Colburn and McCrea and the above-discussed testimony of many other witnesses certainly presented a question of fact as to McCrea's guilt, for consideration by the jury. The jury are the judges of the facts. They saw and heard Colburn, McCrea, and other witnesses and were in a better position to determine the credibility and weight to be given their testimony. We are satisfied that there was ample testimony from which the jury could reasonably find McCrea guilty, beyond a reasonable doubt, of the conspiracy to obstruct justice as charged. We are not disposed to interfere with the determination of the jury.

Under his above contention that the evidence does not support the verdict, McCrea next argues that

there was a fatal variance between the information charging one conspiracy and the proofs, which, he claims, showed "two separate and distinct" conspiracies. He states in his brief:

"Our contention here is that the verdict is erroneous in that it was obtained by proofs tending to show two separate and distinct conspiracies rather than the one, single conspiracy charged in the information.

"In other words, according to the theory of the prosecution and the proofs developed by the prosecutor, the sheriff's office conspired with Pines and the operators of various illegal enterprises to receive money in return for protection, and thereby a conspiracy to obstruct justice existed; likewise, that there was another distinct conspiracy between the prosecutor's office, Block and operators of illegal enterprises, to pay money in exchange for protection."

This argument is without merit as the testimony of Colburn, Block, Pines, Undersheriff McGrath, and others, if believed, clearly established a connection between the prosecutor's office and the sheriff's office and a single conspiracy. In view of McCrea's argument we shall briefly point out the testimony indicating the connection between the two offices and a single conspiracy.

Thomas C. Wilcox, charged and convicted as a conspirator, was elected at successive biennial elections and held the office of sheriff of Wayne county from January 1, 1937, until his removal by the governor in ouster proceedings in 1939. When Wilcox took office in 1937, he appointed Bernard McGrath as undersheriff and Carl Staebler, charged and convicted as a conspirator, as chief of the civil division of the sheriff's office. McGrath testified, in part:

"In the spring of 1937, Staebler and I discussed how we could collect money from illegal enterprises. Staebler said it was all right with Wilcox. Staebler and I talked to (Gustave) Pines. Pines became the collector of money from illegal places. He turned money over to Staebler, who gave me my share. Sometimes Pines paid me directly. As agreed, the money was divided 10 per cent. to Pines, 25 per cent. of the remainder each to Staebler and myself, and 50 per cent. to Wilcox.

"I posted an order that county detectives would work on assignments only. Pines collected down river. Staebler told me Figurski (alias Ferguson) collected in Hamtramck. When I was going to raid I gave the information to Staebler or Pines at times."

In the early part of 1937 Sam Block, who claimed he was collecting for the prosecutor's office, and Gustave Pines, who claimed he was collecting for the sheriff's office, agreed to co-operate in making collections from, and in supplying each other with information regarding, the illegal businesses that were operating in Wayne county. Block testified as follows regarding his arrangement with Pines:

"He (Pines) explained to me he had a chance to make some money, and he told me what he was doing, and that he understood I was doing the same thing, and he wanted to know if we couldn't co-operate, and which I told him I had no objection to, and he contacted different operators that I never contacted and collected from some of them for me, and I guess it worked both ways for that matter. *In other words, I mean by that that he collected some for me, and I collected some for him. We had a squaring of accounts periodically, every month.*

"In this first conversation when he was telling me about having a chance to make some money, he told me he was collecting for the sheriff's office."

Pines said that Block came to his office "through Staebler" of the sheriff's office soon after the first of 1937.  Pines testified:

"After I became the collector for the Wilcox (sheriff) regime, I was contacted by Sam Block, right after the first of the year of 1937.  Sam Block came up to the office and it was through Staebler (of the sheriff's office) that he come to me.  Block says he was the man taking care of the county for the other (prosecutor's) office.  I had a discussion with Sam Block at that time and place about the people that were paying.  I received information from him on that occasion with reference to these people that were paying that I didn't know.  *  *  *  I learned from Sam Block of various people that I didn't know about before running illegal enterprises that were paying and they made contact with me.  *  *  *

"A cheating place is somebody that goes or operates and don't pay to the sheriff.  We had cheating places occasionally around the county of Wayne.  I would find out about those cheating places, either I would get word from the boys, or I would get word from the people that were operating, and if I would get word from the people that were paying, I would tell Carl (Staebler) about it, and they would send a team out.  When I say, 'the people that were paying,' I mean some of these people we have been talking about here in court.  The team would be sent out for that purpose.  To scare them or sometimes make an arrest.  They would fall in line.  If they didn't fall in line then they would get arrested or closed up or broke up.  I would give information to Sam Block about these cheating places, and he would give me information too.  So that me and Sam Block exchanged information that we received with reference to cheating places."

The testimony clearly establishes that the acts and doings of Colburn, Block, Pines, McGrath, and others were all germane to and a part of the general scheme

or plan of wrongdoing. In *People* v. *Tenerowicz,* 266 Mich. 276, 282, we said:

"If the misconduct charged is all germane to one course of wrongdoing there is only one conspiracy. It may be charged and punished as a single conspiracy."

See, also, the following authorities relating to conspiracy: *People* v. *Fields,* 288 Mich. 166; *People* v. *McKenna,* 282 Mich. 668; *People* v. *Chambers,* 279 Mich. 73; *People* v. *Knoll,* 258 Mich. 89; *Sobin* v. *Frederick,* 236 Mich. 501; *Allen* v. *United States* (C. C. A.), 4 Fed. (2d) 688; *United States* v. *Bruno* (C. C. A.), 105 Fed. (2d) 921; 5 R. C. L. p. 1061; 11 Am. Jur. p. 543; 15 C. J. S. p. 1057.

The testimony discussed above, if believed, clearly established a single conspiracy. There was no variance between the proofs and the information charging a single conspiracy.

Defendant McCrea contends further that the trial court erred in unduly restricting his cross-examination of witnesses as to their testimony previously given before the grand jury. Under this contention he argues that the court erred in permitting the prosecution to use a transcript of the grand-jury testimony for the purpose of refreshing the recollection of witnesses and for the purpose of impeachment and in denying him the use of the testimony for such purposes. He claims the trial court's ruling was prejudicial and denied him due process of law under Michigan Const. 1908, art. 2, § 16, and U. S. Const. am. 14, § 1. In his brief he states his contention as follows:

"What we do complain about is the refusal of the court to permit us to lay a foundation for impeachment of a witness by asking him whether he testified differently when appearing before the grand

jury. In other words our complaint is that the court invoked one rule, namely, a so-called rule of secrecy, against us but permitted the prosecutor to lay a foundation for impeachment, and to impeach, by means of grand-jury testimony, notwithstanding the so-called rule of secrecy invoked against us.  *  *  *

"We do not claim the right of inspection and general use of the transcript. What we do complain of is the establishment of one rule for the prosecution with reference to impeachment and a contrary rule for defendant."

Certain of the defendants and also many of the witnesses for the prosecution had previously testified before the one-man grand jury. The trial court permitted the prosecution to use a transcript of the grand-jury testimony to refresh the recollection of witnesses, to impeach hostile witnesses by questioning them as to their grand-jury testimony, and also to show inconsistencies between the testimony of certain defendants at the trial and before the grand jury. McCrea was permitted to examine and use that part of witnesses' grand-jury testimony which the prosecution had submitted and used. He was also permitted to examine the transcript of all his own grand-jury testimony. However, the court refused to permit him to question witnesses as to their grand-jury testimony for the purpose of laying a foundation for their impeachment. In one instance the court stated to counsel for the several defendants:

"You are not denied the privilege of examining any part (of the grand-jury testimony) that is submitted to the witness on this examination.  *  *  * So that there may be no mistake about it I am extending to counsel the opportunity to examine everything that is submitted (by the prosecution) to the witness. They have had that opportunity.  *  *  *

The ruling, I don't think, should be extended beyond that."

Both the prosecution and McCrea claim that the following statutes relating to the secrecy of grand-jury proceedings sustain their respective contentions:

"And in respect of communicating or divulging any statement made by such witnesses during the course of such inquiry, the justice, judge, prosecuting attorney and other person or persons who may, at the discretion of such justice, be admitted to such inquiry, shall be governed by the provisions of law relative to grand jurors." 3 Comp. Laws 1929, § 17218 (Stat. Ann. § 28.944).

"Members of the grand jury may be required by any court to testify, whether the testimony of a witness examined before such jury is consistent with, or different from the evidence given by such witness before such court; and they may also be required to disclose the testimony given before them by any person, upon complaint against such person for perjury, or upon his trial for such offense." 3 Comp. Laws 1929, § 17233 (Stat. Ann. § 28.959).

The prosecution's right to use a transcript of the grand-jury testimony for the purpose of refreshing the recollection of witnesses or for impeachment purposes is admitted by defendant McCrea and has been repeatedly recognized in this State. *People* v. *Baxter,* 245 Mich. 229; *People* v. *Butler,* 221 Mich. 626; *People* v. *Prevost,* 219 Mich. 233; *People* v. *Salsbury,* 134 Mich. 537. See, also, *United States* v. *Socony-Vacuum Oil Co., Inc.,* 310 U. S. 150 (60 Sup. Ct. 811, 84 L. Ed. 1129).

However, the prosecution's examination of hostile witnesses and cross-examination of defendants as to their grand-jury testimony did not open the door for McCrea to cross-examine witnesses concerning

their grand-jury testimony. In *People* v. *Butler, supra,* p. 631, we said:

"The court was not in error     *     *     *     in permitting the prosecuting attorney to cross-examine the defendants as to that part of their testimony before the grand jury which he claimed was inconsistent with their testimony given on the trial.     *     *     *     *This did not open the way for counsel for the defendants to examine the witnesses as to other proceedings before the grand jury,* neither did it justify his demand that the transcript of all of the testimony be delivered to him.     *     *     *

"No other part of the testimony than that permitted to be used by the statute was admissible, and therefore counsel cannot justly complain that he was not permitted to use the entire transcript or that he was not allowed to examine the witnesses on matters not authorized by· the statute."

See, also, *People* v. *Baxter, supra; People* v. *Prevost, supra.*

Section 17233, 3 Comp. Laws 1929, quoted above, does not give McCrea the right, as claimed by him, to question witnesses as to their grand-jury testimony for the purpose of laying a foundation for their impeachment. Such statute does provide a method by which McCrea could have made use of the grand-jury testimony for the purpose of impeachment by showing that the testimony of a witness at the trial was "different from" his testimony before the grand jury. He could have examined or cross-examined witnesses without referring to their grand-jury testimony. If he was not satisfied with their testimony, he could have called either Judge Ferguson or the stenographer who took the grand-jury testimony to testify as to whether the witnesses' testimony before the grand jury was "different from" the evidence given by such witnesses at the

trial. *People* v. *Butler, supra.* The testimony given by a witness at the trial would be a sufficient foundation for his subsequent impeachment by showing, in the manner prescribed by the above statute, that he testified differently before the grand jury.

In *People* v. *O'Neill,* 107 Mich. 556, we said:

"The present case is completely covered by this statute. Members of the grand jury can testify, in a proper case, to statements of witnesses made before them. The respondent could have introduced their testimony to contradict the testimony of the people's witnesses."

McCrea's contention that it would have been futile to call Judge Ferguson as a witness is without merit. He was not denied the right to call either Judge Ferguson or the stenographer. Having failed to avail himself of the above-discussed statutory method of obtaining the benefit of the grand-jury testimony for impeachment purposes, he cannot claim the trial court erred in denying him the right to examine witnesses as to their grand-jury testimony. The cases of *People* v. *Koukol,* 262 Mich. 529 (87 A. L. R. 878), and *In re Archer,* 134 Mich. 408, and other authorities cited by McCrea do not sustain his contention.

We are satisfied that the trial court did not err in restricting McCrea's use of the grand-jury testimony and in denying him the right to question witnesses as to their grand-jury testimony for the purpose of laying a foundation for impeachment. He was not denied due process of law. However, in this connection we make reference to our comment in *People* v. *Stambaugh, post,* 300.

McCrea next contends that the trial court erred in denying his original motion to quash the information and to set aside the order holding him for trial.

Under this contention he first argues that the testimony taken at the preliminary examination did not show probable cause to hold him for trial. The testimony taken at such examination is not contained in the record. The record shows that, in pursuance of written stipulation, an order was entered by the trial court in January, 1942, providing:

"That the testimony * * * as to defendant McCrea taken * * * on the preliminary examination * * * need not be printed in the printed record * * * by reason of the expense and difficulty of copying same, but that the same may be transmitted to the Supreme Court * * * and may be used by all parties in the same manner as though printed in the printed record."

McCrea admits that he was permitted to examine the transcript of such testimony in the office of the clerk of the circuit court but that the clerk refused to forward such transcript to this court. Several months elapsed between the entry of the above order and the argument of the case. We believe that McCrea could by reasonable diligence have had either the original transcript of such preliminary examination, or a copy thereof, filed in this court. Since the testimony is not before us, we cannot consider it. *People* v. *Wilson,* 242 Mich. 532; *People* v. *Butler, supra.*

In his brief McCrea suggests that an order be entered herein permitting him to withdraw the transcript from the office of the clerk of the circuit court for the purpose of incorporating it in a supplemental printed record. We find no justification for the entry of such order.

Under his contention of error in denying his original motion to quash the information and set aside the order holding him for trial, McCrea further argues that he was denied due process of law, be-

cause Judge Ferguson was disqualified from holding the preliminary examination. He bases such claimed disqualification on the ground that as a one-man grand jury Ferguson had indicted him; that Ferguson had made a presentment to the governor of the State for his removal as prosecuting attorney; and that, because of the widespread publicity regarding his indictment, Ferguson was "placed in a position where he must either virtually repudiate his actions in indicting defendant (McCrea), when sitting as a grand jury, or hold him for trial as a matter of course."

Judge Ferguson was authorized and empowered by 3 Comp. Laws 1929, §§ 17217, 17218, and 17118 (Stat. Ann. §§ 28.943, 28.944, and 28.843) to act as the examining magistrate in conducting McCrea's examination and to order him held for trial. Judge Ferguson was also authorized and empowered by 3 Comp. Laws 1929, § 17218, to file presentment with the governor of the State for McCrea's removal.

The fact that Judge Ferguson had acted as a one-man grand jury and had filed presentment with the governor for McCrea's removal did not disqualify him from holding the preliminary examination. The record contains no affidavit substantiating McCrea's charge of prejudice and bias on the part of the examining magistrate. Our attention has not been called to any act or conduct on the part of Judge Ferguson, while conducting the preliminary examination, from which prejudice or bias could be inferred. Furthermore, the law is well settled that the due-process clauses of the Federal and State Constitutions do not require a preliminary examination in criminal proceedings. *Woon v. Oregon,* 229 U. S. 586 (33 Sup. Ct. 783, 57 L. Ed. 1340); *State, ex rel. Germain,* v. *Ross,* 39 N. D. 630 (170 N. W. 121); *Penton v. State,* 194 Ark. 503 (109 S. W. [2d]

131); *State* v. *Brett,* 16 Mont. 360 (40 Pac.
873); *State* v. *Sureties of Krohne,* 4 Wyo. 347 (34
Pac. 3); 1 Bishop, New Criminal Procedure (2d
Ed.), p. 191; 6 R. C. L. p. 467, 8 Cyc. p. 1090; 16 C.
J. S. p. 1179; Hopkins, New Federal Penal Code,
p. 5.

The trial court did not err in denying McCrea's
motion to quash the information and to set aside
the order holding him for trial. He was not denied
due process of law.

McCrea's next contention is that he was denied
due process of law because of errors and irregulari-
ties in the conduct of the trial. Under this conten-
tion he objects to the order in which the prosecution
put in its proofs. As there were more than 30 de-
fendants and over 100 witnesses, it would un-
doubtedly have been· difficult, if not impossible, for
the prosecution to present all testimony relating to
McCrea or any defendant at one time and before pre-
senting testimony as to other defendants. The order
of proof was within the discretion of the trial court,
and we find no abuse of such discretion. In *People*
v. *Saunders,* 25 Mich. 119, 121, we said:

"There is no class of cases (conspiracy) in which
it is more important that the circuit judge should
have a large discretion as to the order in which
evidence should be received; and this discretion
cannot be reviewed on error except in clear cases of
abuse."

McCrea alleges improper and prejudicial questions
were asked by the prosecution, and we have carefully
examined the record on this point. The trial con-
tinued, with some interruptions, for several months.
Both the prosecution and the defense of McCrea
and other defendants were handled by able and ag-
gressive attorneys. McCrea, who, appearing *in*

*propria personam,* handled much of his own defense, was experienced and well-versed in the trial of criminal cases. Some animus apparently existed, or quite naturally developed, between counsel, particularly between McCrea and the special prosecutor. Questions were asked and statements were made by both the prosecution and the defense that might better have been omitted. However, under all the circumstances of the trial, we do not find reversible error as to questions asked by the prosecution.

During the trial McCrea attempted to cross-examine a witness as to her testimony before the grand jury. After sustaining the prosecution's objections to several questions of this type, the trial court said:

"I will not permit you (McCrea) to go any further. I have already made a ruling on that and there is no necessity of cumbering up the record, but you may have the benefit of the ruling and take it as far as you like."

McCrea claims that the above-quoted statement by the court was an intimation to the jury that he would be convicted and constituted reversible error. We cannot agree with such claim and are satisfied that the trial court's statement was not reversible error. *People* v. *Kimbrough,* 193 Mich. 330.

McCrea next contends that the trial court erred in the admission of certain evidence showing separate and distinct offenses. Evidence was admitted that Sam Block talked with McCrea's chief investigator, Colburn, regarding one Watson, who operated a lottery or mutuel known as the Yellow Dog; and that Block thereafter collected money from Watson. In his cross-examination of Block defendant Colburn's attorney brought out evidence that Block collected money from one Ryan who operated the

Consolidated News Agency which was engaged in the business of disseminating horse-racing information. Block said that the money collected from Watson and Ryan was a part of the total amount he paid over to Colburn. McCrea objected to this testimony involving Watson and Ryan, on the ground that they were not defendants nor were they alleged to be conspirators, and that the conspiracy did not involve the Yellow Dog mutuel or the Consolidated News Agency. He also objected to the admission of testimony involving payments made by conspirator Harry Kivlin to the chief of police of River Rouge to be turned over to the mayor of that city, on the ground that the mayor was not a defendant or alleged conspirator. The evidence shows that Block was collecting from Kivlin and also that Kivlin was paying the chief of police for the benefit of the mayor, for the privilege of operating his own gambling businesses.

Such testimony involving Watson, Ryan, and the mayor of River Rouge was admitted in pursuance of 3 Comp. Laws 1929, § 17320 (Stat. Ann. § 28.1050), which provides:

"In any criminal case where the defendant's motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime by the defendant."

In admitting the testimony relating to Watson and Ryan, the court properly stated:

"Well, those acts are not admissible to prove the *res gestae*. They are merely admissible as bearing upon the question of the intent that may be involved, and it is upon the general plan or scheme.   *   *   *

"They will not be binding upon any defendants who, at the time the acts were committed, are not shown to have been connected with the conspiracy."

The information charged a conspiracy to obstruct justice; and a conspiracy implies or connotes a plan. The testimony regarding payments by Watson and Ryan to Block and regarding the mayor of River Rouge was of probative value and was, under the above-quoted statute, properly admissible as tending to show "a scheme, plan or system   *   *   * notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime." Furthermore, such testimony regarding payments by Watson, Ryan, and Kivlin to Block was undoubtedly admissible as a part of the *res gestae.*

See *People* v. *Ewald,* 302 Mich. 31; *People* v. *Beller,* 294 Mich. 464; *People* v. *Woods,* 206 Mich. 11; *People* v. *McGarry,* 136 Mich. 316; *People* v. *Petheram,* 64 Mich. 252; *People* v. *Henssler,* 48 Mich. 49; *People* v. *Arnold,* 46 Mich. 268; 1 Wharton's Criminal Evidence (11th Ed.), pp. 285, 286; 3 Encyclopedia of Evidence, pp. 408, 409; 3 Greenleaf on Evidence (16th Ed.), pp. 101, 102, §§ 93, 94; 2 Gillespie's Michigan Criminal Law and Procedure, p. 1296; 4 Chamberlayne on Evidence, p. 4487 *et seq.,* § 3244.

In *People* v. *Chambers,* 279 Mich. 73, we said, p. 78:

"All of the acts and facts upon which any reasonable presumption of the truth or falsity of the charge made against the defendants in the information could be founded were admissible. * * *. And where a conspiracy exists, what was said or done by any of the members of the conspiracy in furtherance of such conspiracy is admissible."

In *People* v. *Seaton* (syllabus), 235 Mich. 698, it is stated:

"If proffered testimony tends to prove the offense charged, it is not incompetent because it also tends to prove the commission of another offense."

See *People* v. *Jackson,* 280 Mich. 6; *People* v. *Savage,* 225 Mich. 84; *People* v. *Nagle,* 137 Mich. 88; *People* v. *Farrell,* 137 Mich. 127; *People* v. *Wilson,* 55 Mich. 506; *People* v. *Mead,* 50 Mich. 228; *People* v. *Marble,* 38 Mich. 117; *People* v. *Doyle,* 21 Mich. 221.

In summary we conclude that there was no reversible error in admitting the above-discussed testimony relating to Block, Watson, Ryan, Kivlin, and the mayor of River Rouge.

We find no merit in McCrea's objection to the question asked a Hamtramck police officer, Ratajack, as to whether one Gell had paid him money, since Ratajack, standing on his constitutional rights (Const. 1908, art. 2, § 16) refused to anwer.

McCrea next contends that the trial court erred in refusing to give certain requested charges to the jury. Under this contention he first complains that the court erred in not giving the following requested charge:

"I charge you, members of the jury, that the testimony of an accessory in a crime should be received with extreme caution and every possible motive for

falsehood should be taken into consideration as affecting his credibility."

In his brief McCrea clearly indicates that the above-quoted charge was requested with particular reference to the testimony of his chief investigator, defendant Colburn, who during the trial pleaded guilty and thereafter testified for the prosecution. He cites, as authority for his contention, the case of *People* v. *Nunn,* 120 Mich. 530, in which a somewhat similar charge was included as a part of the general charge of the court on the question of credibility of testimony. In the *Nunn Case* there was no request that such charge be given and no question raised as to whether the giving of, or failure to give, such charge was reversible error. Such case goes no further than to hold by implication that the giving of the charge was not error. The *Nunn Case* does not sustain McCrea's contention that the trial court erred in failing to give his requested charge above quoted. In the present case the trial court instructed the jury on the matter of credibility of testimony, as follows:

"You are the sole judges of the credibility of witnesses. It is for you, and you alone, to say what weight and credence shall be given to the testimony of any witness who has testified in this case. In measuring and weighing the testimony of any witness you have a right to take into consideration his or her appearance on the stand, his or her apparent candor or want of candor in testifying; his or her knowledge or want of knowledge of the matter concerning which he or she has testified. And in weighing and measuring the testimony of any witness, and in determining what credence shall be given to that testimony, you have a right to take into consideration any bias or prejudice, or motive that may have actuated the witness in so testifying. You have a

right to take into consideration any interest which the witness may have in the outcome of the case. You have no right for light or trivial reasons to find that any witness has testified falsely, and it will be your duty, if possible, to reconcile and harmonize the testimony upon the theory and basis that each and every witness has attempted to tell the truth. If you are unable to so reconcile and harmonize the testimony of the witnesses, it will be your duty to determine which is true and that which is untrue, and when you have made that determination to discard and disregard the testimony which you find to be untrue, and to reach a verdict based upon evidence in the case which under all the circumstances you believe to be true.''

In *People* v. *Wallin,* 55 Mich. 497, 505, we said:

''The defense also requested the judge to point out to the jury the circumstances tending to discredit the witness Howard; and this was refused. We repeat that instructions respecting the credibility of witnesses, which involve no question of law, are not matter of right. The judge is under no obligation to comment upon the facts; he may, if he chooses, confine himself strictly to laying down such rules of law as must guide the action of the jury, and leave the facts to them without a word of comment. In many cases this is no doubt the desirable course. And it is always within the discretion of the judge to adopt it.''

In approving the charge of the trial court in *People* v. *Knoll,* 258 Mich. 89, 101, we stated:

''The purpose of instructions is to enable the jury to more intelligently determine the facts from the evidence submitted, and to apply the law thereto. Many of the trial judges believe that they may more satisfactorily perform the duty thus imposed on them by giving such instructions in their own language rather than by reading to the jury those sub-

mitted to them in the form of requests. And, when the instruction as given fairly covers the material substance embodied in the requests, error may not be predicated upon such refusal.''

See, also, *People* v. *Plummer,* 189 Mich. 415; *People* v. *Dumas,* 161 Mich. 45; *People* v. *Crawford,* 48 Mich. 498; *People* v. *Schweitzer,* 23 Mich. 301.

The trial court's instruction (above quoted) fully and fairly covered the question of the credibility and weight to be accorded the testimony of all witnesses including witness Colburn. Such instruction fully protected McCrea's rights, and there was no error in failing to give his requested charge.

McCrea next claims that the trial court erred in failing to give the following charge:

''I charge you, members of the jury, that the previous good character and reputation of Duncan C. McCrea should stand in his favor when he takes the stand and denies the accusations of Harry Colburn, a self-confessed felon, whose testimony as against McCrea, stands unsupported and is contradicted by other evidence.''

The court did not give such charge but did instruct the jury in regard to the testimony of character witnesses, in part, as follows:

''Members of the jury, some of the defendants have produced character witnesses, who have testified in their behalf, and concerning the good reputations of such defendants, for truth and veracity, their honesty and as peaceful and law-abiding citizens. You should consider their testimony carefully in passing upon the guilt or innocence of the defendants in whose behalf such testimony was given, and in determining the weight you will give to the testimony of the defendants who have testified in their own behalf. Good character is

an important fact with every man, and never more so than when put upon trial for an offense which is rendered improbable by a uniform course of life which may have been or is wholly inconsistent with any such crime. Good character may not only raise a doubt of guilt, which otherwise exists, but bring conviction of innocence, and as to that weight you will give the testimony touching his character, you must determine in view of the other evidence in the case, ascertaining what opportunity these people, who have testified to his good reputation have had to form an opinion, which is entitled to your consideration touching that subject.

"I charge you, also, that if the evidence in this case carries a conviction of the truth of guilt beyond a reasonable doubt in the minds of the jury, that is, if it becomes evidence convincing and satisfying the minds and conscience of the jury of the truth of guilt of the accused beyond all reasonable doubt, their character, however noble in the past, must give way to the inevitable result of crime."

Such charge fully and fairly instructed the jury on the question of the weight to be given testimony as to McCrea's previous good character. *People* v. *Barrette,* 233 Mich. 615; *People* v. *Mathews,* 207 Mich. 526; *Campbell* v. *People,* 34 Mich. 351. Furthermore, McCrea's requested charge should not have been given in the form presented, because it clearly attempted to focus the jury's attention on his own assertion of "previous good character and reputation" as against his assertion as to the character of witness Colburn. The trial court did not err in failing to give the requested charge.

Defendant McCrea next alleges that the trial court erred in not giving the following requested charge:

"I instruct you, members of the jury, that it is the duty of each and every member of the jury in this case to decide the issues presented for himself or

herself, and if, after a careful consideration of all the evidence in the case, the instructions of the court, and free consultation with the other jurors, there is a single juror that has a reasonable doubt of Duncan C. McCrea's guilt, it becomes the duty of the juror, under his or her oath, to adhere to this conclusion and vote for the acquittal of Duncan C. McCrea. A juror should never yield his or her conclusions simply because others on the jury may agree or disagree with him or her.''

The court did not give such specific charge, but did instruct the jury, in part, as follows:

''You are to start out upon the trial of this case with the presumption uppermost in your minds that each and every one of the defendants is innocent. This presumption is a legal one and continues in favor of each respondent up until the time of trial, and thereafter throughout the trial and until such time as each and every one of you shall be satisfied beyond a reasonable doubt and to a moral certainty of his guilt.

''The facts proven must be inconsistent with the theory of innocence, and with any theory except that of guilt. When, therefore, there are in any case two theories equally reasonable, which are inconsistent with each other, and the one tends to show the innocence of the accused, or where there is any testimony subject to two interpretations, one of guilt and one of innocence, then it is your duty to give the defendant the benefit of a reasonable doubt and adopt the theory which tends toward his innocence.   *   *   *

''The burden is not upon the defendants to prove their innocence. Quite to the contrary, the burden is upon the people to satisfy you by competent evidence beyond a reasonable doubt, and to a moral certainty of their guilt.   *   *   *

''I charge you further that if after a careful consideration of all the evidence in this case, following the instructions which I am giving you as to the

law, there shall remain in your minds a reasonable doubt as to the guilt of any one of these defendants, whether the same be as to one, more than one, or several, it is your duty to give to such defendant or defendants the benefit of such doubt and to acquit such defendant or defendants, as the case may be. * * *

"If you decide that such a conspiracy, as alleged, did actually come into existence within the period alleged, your next consideration should be directed to a question as to who, if anyone, among the defendants, later became parties to the conspiracy, and by what means or method did they attach themselves thereto."

In *People* v. *Curtis,* 97 Mich. 489, the trial court instructed the jury:

"This man is presumed to be innocent until he is proven guilty. There is about him that presumption, and it attaches to the entire case. The burden is upon the people to prove his guilt beyond a reasonable doubt. He is presumed to be innocent until proven guilty, and all of the jury must be satisfied beyond a reasonable doubt in order to convict."

In sustaining such instruction we said:

"The instruction given was all that the law requires. * * *
"To hold that jurors, under the instruction, would not understand their duty, would be to say that they were not possessed of common sense."

See, also, *People* v. *Goodfellow,* 257 Mich. 196; *People* v. *Powers,* 203 Mich. 40; *People* v. *Wood,* 99 Mich. 620; *People* v. *Hammond,* 177 Mich. 416; *People* v. *Hoffmann,* 142 Mich. 531.

The trial court's charge above quoted ably and properly instructed the jury as to their duty and amply protected McCrea's rights. There was no error in failing to give the requested charge.

McCrea next alleges error in failing to give the following charge:

"I charge you further, members of the jury, that the duties of Duncan C. McCrea as prosecuting attorney of Wayne county are prescribed by law and that nowhere in the statutes of the State of Michigan is it prescribed that the prosecuting attorney or any member of his staff shall be charged with the duty of making arrests, conducting raids or otherwise taking any active part in the apprehension of law violators, but on the contrary our Supreme Court has ruled that he is a quasi-judicial officer and that if he proceeds upon such a course of action, he does so at his peril and loses the immunity granted to a quasi-judicial officer, thereby subjecting himself to damages."

McCrea states in his brief that "the court in effect charged the jury that there was a duty on the part of defendant as prosecuting attorney to conduct raids." This was erroneous as we find no statement to that effect in the court's charge. The court fully instructed the jury as to the powers and duties of McCrea, as prosecuting attorney, under the laws of the State. There was no error in failing to give the specific charge requested by McCrea.

McCrea next claims that the trial court erred in denying his motion for a mistrial, based upon the jury's examination in the jury room of a part of the transcript of the testimony. Such motion for a mistrial was predicated upon the following incident which occurred soon after the jury had retired and begun its deliberations. A request was sent from the jury room for the testimony of witness Sam Block. An officer of the court obtained the three volumes of the transcript containing Block's testimony and gave such volumes to an officer in charge of the jury, and such officer handed the volumes to

the foreman of the jury. This occurred without the knowledge or consent of the trial court. About six or seven minutes after the volumes were sent into the jury room, counsel for some of the defendants informed the court what had occurred. The court immediately had such volumes of testimony removed from the jury's possession. The volumes had been in the jury room about 10 minutes. The court promptly recalled the jury to the courtroom and the record shows that the following took place:

"*The Court:* Members of the jury, I was advised by Officer Hunter that there was a request from the jury for the testimony of the witness Sam Block; the foreman of the jury may speak for you. Am I correctly advised?

"*Foreman Holmes:* That is right.

"*The Court:* It has just been called to my attention that in my absence and without any instruction from the court, that testimony was just handed to you by the officer; is that right?

"*Foreman Holmes:* That is right, your honor.

"*The Court:* How long ago did that happen?

"*Foreman Holmes:* About 10 minutes ago.

"*The Court:* Have you read over any of that testimony?

"*Foreman Holmes:* Very little.

"*The Court:* Will the officer produce the volumes that were surrendered to him?

"That the record may be clear, as soon as this request was communicated to me, word was sent to the reporters to appear here, and to bring this testimony. I don't know by what mistake this was turned over to you without having first been authorized by the court.

"I have before me now what appears to be volumes 10, 11, and 13.

"What is the request of the jury with reference to the testimony of Sam Block?

"*Foreman Holmes:* With respect to a defendant, your honor.  *  *  *

"*The Court:* What was it you particularly wanted to have read to you from his testimony?

"*Foreman Holmes:* In respect to the defendant Lyle Hartrick.  *  *  *

"*The Court:* Had you found that part of the testimony before these volumes were retrieved from you?

"*Foreman Holmes:* We had, your honor.

"*The Court:* These volumes which have been handed to you have not been authenticated, and there is nothing in the record at this time to show that these are the correct and accurate transcripts of the testimony of this witness.

"These three volumes, 10, 11, and 13, having been submitted to you, it will be necessary at this stage of the proceedings that the reporters who prepared these volumes appear in court in order that this record may affirmatively show that which has been submitted to you, without the previous order of the court, is the authentic testimony of these witnesses."

At this point the court stenographers who had taken the testimony of witness Block were called and testified as to the authenticity of the transcript of testimony of witness Block, which had been in the possession of the jury. The record shows further inquiry by the court, as follows:

"*The Court:*  *  *  *  I might inquire from the foreman whether any testimony was examined other than that of Sam Block, while you had these volumes.

"*Foreman Holmes:* No, your honor, just that one.

"*The Court:* Just that one of Sam Block. All right.  *  *  *

"*The Court:* At this point, let me interrupt, and ask you, members of the jury, whether there are any special requests for the testimony of Sam Block that you wish to make to the court? In order that we may know what it is that you want and have it properly presented to you?

"*Foreman Holmes:* Your honor, our request is only to find if he was identified as owner or operator.

"*The Court:* Well, you want Block's testimony?

"*Foreman Holmes:* In regard to that.

"*The Court:* You may return to your jury rooms and continue with your deliberations.  *  *  *

"*Mr. Darin:* If your honor please, before the jury retires, for the purpose of keeping the record straight, may we inquire if there was any other testimony submitted to them in the same manner at any other time, just so that we have the record straight?

"*Foreman Holmes:* No, other than the slips of Gustave Pines and the addresses.

"*The Court:* You have reference now to exhibits?

"*Foreman Holmes:* That is right.  *  *  *

"*The Court:* Which were produced by Pines?

"*Foreman Holmes:* That is right.

"*The Court:* Which the record may show you asked for and they were given to the officer to be given to you.

"*Foreman Holmes:* That is right, your honor.

"*The Court:* They were exhibits which were offered in this case."

After the jury had retired to the jury room, defendant McCrea moved for a mistrial, stating, in part:

"I object to the fact that the jury was given exhibits without it being done in open court, without the knowledge of this defendant, and I am told now of the exhibits of Mr. Pines, and I most strenuously object to the fact that transcripts were given in the jury room to them, and I also object to the fact that they were questioned as to what they had done in the jury room with reference to the transcript.

"It is my contention that by so doing the actions of the jury in judging the facts were opened up improperly.

"And I move the court at this time for a mistrial in this case because I believe the error that has oc-

curred is so prejudicial and inflammatory that no charge of the court could cure it, nor no instructions of the court, nor no testimony taken by the court.''

The record shows that sometime later on the same day the jury was recalled to the courtroom and the following occurred:

"*The Court:* In view of the requests that have been previously made for the testimony of Sam Block, and in order that we may correctly understand what you want at this time, I will ask the foreman what, if any, portion of the testimony of Mr. Block you still desire in order that we may have it ready to submit to you when we reconvene at 2 o'clock?

"*Foreman Holmes:* The portion that we wish to know about was where he was an operator of a handbook on Joseph Campau [street], for Lyle Hartrick.

"*The Court:* Is there any other inquiry concerning testimony that you desire presented to you?

"*Foreman Holmes:* We would also like the testimony of Jacob Klugman.''

When the court reconvened in the afternoon, those portions of witness Block's testimony requested by the jury and also the testimony of witness Klugman were read to the jury.

McCrea claims that it was highly prejudicial to permit the jury, in its deliberation, to have in the jury room any portion of the transcript of testimony of any witness, because such testimony was "likely to be given undue prominence and weight." He also alleges prejudice because volume 10 of the testimony, which was sent into the jury room as above mentioned, contained the transcript of a colloquy between the court and counsel, in the absence of the jury, regarding certain social activities of the jury while confined in a local hotel during the trial.

McCrea cites *People* v. *Chambers,* 279 Mich. 73,

and *People* v. *Dowdigan,* 67 Mich. 92, as sustaining his contention that a mistrial should have been granted. The facts in the *Chambers Case* clearly distinguish it from the situation in the case at hand. The gross misconduct of the officer, which justified a new trial in the *Chambers Case,* was highly prejudicial and presented an entirely. different situation from that now before us. In the present case three volumes of testimony were, through a "blunder" by the officer, handed through the doorway of the jury room to the foreman of the jury and remained in the jury's possession for only about 10 minutes. While emphatically condemning the practice, in criminal cases, of permitting any part of the transcript of testimony to reach the jury room without the express approval and order of the court, we are, from our examination of the record, unable to discover how McCrea was prejudiced by the above-discussed incident. It affirmatively appears that the jury did not examine any portion of the three volumes except a part of Block's testimony. As the jury read no part of the testimony that it could not have received and did later receive in open court when it was read to them, McCrea was not prejudiced. The mere fact that the volumes of testimony were present in the jury room for not exceeding 10 minutes, without some showing that prejudice may have resulted, would not constitute grounds for reversible error. *People* v. *Hawthorne,* 293 Mich. 15; *People* v. *Tibbetts,* 173 Mich. 628; *Findley* v. *People,* 1 Mich. 234.

In 16 R. C. L. pp. 302, 303, it is stated:

"The general rule is that where a paper which should not properly be with the jury during their deliberations has been sent to the jury room through inadvertence or accident, and not through the connivance or design of the prevailing party, the ver-

dict will not generally be set aside on that account if it does not appear that the paper was of a character to prejudice the unsuccessful party or that other circumstances rendered the reading of it harmful. * * * Following the general principle stated, though the practice of permitting the jury to take to the jury room such articles or exhibits unless the defendant consents may not be favored, where it does not appear that they were used or handled by the jurors in a manner not consistent with the evidence, it does not constitute error. It cannot be said that, by taking exhibits to the jury room, the jury thereby receives evidence out of court; nor that the taking of exhibits by the jury constitutes misconduct. And even if exhibits or papers are improperly in the jury room it has frequently been held that, in the absence of a showing of prejudice, it is not error. * * * When by mistake or inadvertence on the part of a juryman or the court, or even through error of judgment on the part of the court, an article has been taken to their room by the jury which ought not to have been, then before a verdict will be set aside for that cause, it must appear, either from an examination of the objectionable article itself, or from facts properly presented by the bill of exceptions, that such article must have been, in the nature of the case, or in point of fact was, considered by the jury in arriving at the conclusion reached by their verdict.''

See, also, 39 Am. Jur. pp. 97-99, § 84; 2 Thompson on Trials (2d Ed.), pp. 1873, 1874, § 2590; 1 Hayne, New Trial and Appeal (Rev. Ed.), pp. 314-318, §§ 66, 67.

The cases of *People* v. *Chambers, supra,* and *People* v. *Dowdigan, supra,* and other authorities cited by McCrea do not sustain his contention that a mistrial should have been granted.

We agree with the trial court who, when consider-

ing the above-discussed incident in connection with McCrea's motion for a new trial, said, in part:

"The furnishing of the testimony to the jury during its deliberation was not grounds for mistrial inasmuch as the jury did not examine any portion of the three volumes except that portion of the testimony of Sam Block relating to the defendant Lyle Hartrick. This statement was made in open court upon the record by the foreman of the jury and no member of the jury disputed his statement. No harm was done in the opinion of this court to any defendant inasmuch as the jury only had these volumes for a few moments before they were redeemed by the court and the jury had nothing before it that they could not have received and did not receive later in open court when the entire testimony relating to Lyle Hartrick was read to them in the presence of the defendants and their counsel under the instructions of the court. If there was any error in that which happened it was not harmful error and was at most an unfortunate mistake which injured nobody in the opinion of this court."

We are satisfied that the trial court commendably handled the rather unfortunate situation relating to the three volumes of testimony being sent into the jury room. There was no error in denying McCrea's motion for a mistrial.

Defendant McCrea next contends that the court erred in denying his motion to quash the information because of the prosecution's failure to indorse certain witnesses as *res gestae* witnesses on the information at the time of filing.

The information filed in December, 1940, contained a list of more than 125 witnesses. The first witness called by the prosecution was William E. Dowling, who, prior to the time of the trial, had been elected prosecuting attorney of Wayne county. It appears

that immediately following the Janet McDonald suicide in 1939, Dowling, then acting as prosecutor in McCrea's absence, was questioning witnesses in the prosecutor's office in connection with his investigation of the accusations made in the McDonald suicide letters.   Dowling testified:

"I was questioning Mr. McBride.   Lieutenant John McCarthy sat at one side of the room.   He was in charge of the vice squad of the city of Detroit police department.   Acting Superintendent Fred Clark was sitting in a big leather chair in the prosecutor's office.   This happened in McCrea's office. Sergeant George Rose of the homicide squad was in the office, as was Lieutenant Tom Hutchinson in the office.   They are both of the homicide squad, this being a suicide and murder.   I was questioning McBride when the phone rang.   I answered the phone. It was McCrea.   I had a conversation with him at that time and place.

"*Mr. McCrea:* Just a minute, your honor please, with reference to this conversation, I move the court to quash the information because the *res gestae* witnesses are not indorsed on the information. I understand, under the law, it is the duty of the prosecution to give to the jury all of the facts of all of the witnesses who were there.   You will not find the names of the two homicide detectives, or Mr. Rose and Mr. Hutchinson, the two F. B. I. officers who were present, or Mr. Fleming who was present at least part of the conversation, although those names were well known to the prosecution, having been brought out at the examination in this case.   *   *   *

"*Mr. McCrea:* We claim it is illegal to indorse those witnesses unless at the time of filing. He (special prosecutor) has no business to leave them off; if he does it intentionally and deliberately, the information should be quashed."

Later in the course of the trial the prosecution called one Maycock, a State police officer, who testi-

fied regarding raids on gambling establishments in Grosse Pointe. Maycock's name was included in the list of witnesses indorsed on the information. His testimony indicated that several other officers were present with him in the prosecutor's office when the matter of the issuance of warrants was discussed. The names of the officers, other than Maycock, were not indorsed on the information at the time of filing. McCrea claims that such other officers were *res gestae* witnesses and that the information was defective because their names were not indorsed thereon. During the trial McCrea filed written motion to quash the information for the following reasons:

"Because the so-called prosecuting attorney, Chester P. O'Hara, has failed to indorse on the information *res gestae* witnesses known to him at the time of filing said information. * * *

"Because the said failure to indorse the *res gestae* witnesses was deliberate and intentional on the part of the said Chester P. O'Hara and that their names and their knowledge of alleged facts, claimed to be pertinent by the said Chester P. O'Hara, were well known to him at the time the said information was filed; that the names of the *res gestae* witnesses, known to the prosecutor and deliberately and intentionally left off the list of witnesses in the information, are as follows: (list of about 17 witnesses)."

In denying such written motion to quash, the court said, in part:

"I have this thought in mind, if there is any question about any of these parties whose names have been mentioned as being *res gestae* witnesses, their names should be on the information. It is impossible for me to determine, without a complete examination of volumes of evidence taken at the examination, whether these witnesses should be indorsed or not. * * *

"In the absence of any objection on the part of either the prosecution or the defense, other than the respondent McCrea, who asks to have the information quashed, there may be an order made at this time indorsing on the information the following names: * * * (list of 10 witnesses). I am not prepared at this time to pass intelligently on the question whether the other witnesses should or should not be indorsed. If Mr. McCrea so desires, the names of the other witnesses may be conditionally indorsed on the information and those witnesses subpoenaed to appear before the court and counsel for the respondent and these witnesses cross-examined or examined in the absence of the jury for the purpose of determining whether they properly belong on the information as *res gestae* witnesses. I know of no way that the court can more intelligently or fairly dispose of this matter at this time. * * *

"Mr. McCrea, you may advise the court whether you wish to take advantage of my offer to have the other witnesses produced for examination to determine whether they should be indorsed.

"*Mr. McCrea:* Just a moment, your honor. Your honor please, I prefer not to make any request. I made a motion which I consider proper.

"*The Court:* I am tendering to you that offer now, Mr. McCrea, so that the record may show that I am not depriving you the opportunity of having anyone you claim is a *res gestae* witness. I do not feel that I am compelled to order them on the information without some further showing. The court is offering you this assistance in making that, if you wish to take advantage of it. Otherwise we will pass it."

Subsequent to his conviction McCrea, in his motion for a new trial, alleged, *inter alia,* error by the trial court in denying his above-discussed written motion to quash the information.

McCrea argues that 3 Comp. Laws 1929, § 17254 (Stat. Ann. § 28.980), providing for the indorsement

of *res gestae* witnesses known to the prosecution, is mandatory and that the information against him should be quashed because the names of the above-mentioned witnesses were not indorsed thereon when filed and could not later be added. Such statute provides:

"All informations shall be filed during term in the court having jurisdiction of the offense specified therein, after the proper return is filed by the examining magistrate by the prosecuting attorney of the county as informant; he shall subscribe his name thereto, and indorse thereon the names of the witnesses known to him at the time of filing the same. *Names of other witnesses may be indorsed before or during the trial by leave of the court and upon such conditions as the court shall determine.*"

Certain of the witnesses, whose names the court ordered indorsed on the information, were later called for examination and were cross-examined by McCrea and also by counsel for other defendants. The record does not indicate a claim by McCrea that the testimony of any of the above-mentioned witnesses was suppressed. Neither does the record show claim by McCrea that those witnesses named in his written motion to quash, whose names were not ordered placed on the information by the court, would have given testimony in his defense. Furthermore, the record indicates that McCrea declined the trial court's offer to indorse on the information the names of other witnesses who, by their examination or cross-examination, could be shown to be *res gestae* witnesses.

In support of his motion to quash the information McCrea cites *People* v. *Hill,* 258 Mich. 79, and *People* v. *Blazenzitz,* 212 Mich. 675. The facts of such cited cases clearly distinguish them from the case at hand, in which the names of certain witnesses

claimed by McCrea to be *res gestae* witnesses were indorsed on the information by order of the court and were later called for examination. The court also gave McCrea the opportunity ''to have the other witnesses produced for examination to determine whether they should be indorsed'' on the information, but McCrea declined such offer.

In *People* v. *La Panne*, 255 Mich. 38, the information filed by the prosecutor did not contain the indorsement of any witnesses. However, the names of witnesses were later indorsed thereon.. In that case Mr. Justice Wiest said:

''The statute, Act No. 175, chap. 7, § 40, Pub. Acts 1927 (3 Comp. Laws 1929, § 17254), requires an information to have indorsed thereon the names of the witnesses known to the prosecutor at the time of filing the same. The purpose of this is to impart to the accused knowledge of the names of the witnesses. The information was filed without indorsement of the names of the witnesses but some time before the trial the prosecutor indorsed on the information the names of witnesses and notified the attorneys for the defendant. After the jury was impaneled the prosecutor asked that the names, so indorsed on the information, be sanctioned by the court. This was done. The record discloses no objection. The proceeding was irregular. *We do not find, however, that defendant suffered such prejudice as to call for reversal,* for her counsel had all the information that compliance with the law would have furnished.''

See, also, *People* v. *Mills,* 94 Mich. 630.

The test to be applied in the present case is whether the trial court abused its discretion in ordering the names of certain witnesses, alleged to be *res gestae* witnesses, to be indorsed on the information after filing. *People* v. *Blue,* 255 Mich. 675; *People* v. *Crawford,* 218 Mich. 125; *People* v.

*Luders,* 126 Mich. 440; *People* v. *Durfee,* 62 Mich. 487. In *People* v. *Tamosaitis,* 244 Mich. 258, the court said:

"After the defense had rested, the people called Robert Tetro as a witness in rebuttal. Objection was made because his name was not indorsed on the information. He was permitted to testify, after which a motion to strike out his testimony for the same reason was made and denied. Error is assigned on such action.

"Under section 15761, 3 Comp. Laws 1915, the prosecuting attorney was required to indorse on the information 'the names of the witnesses known to him at the time of filing the same.' It also provided that 'At such time before the trial of any case as the court may, by rule or otherwise, prescribe, he shall indorse thereon the names of such other witnesses as shall then be known to him.'

"Section 40 of chapter 7 of Act No. 175, Pub. Acts 1927 (the code of criminal procedure), requires the indorsement of the names of witnesses at the time of filing, as did the former law. It, however, provides:

" 'Names of other witnesses may be indorsed before or during the trial, by leave of the court and upon such conditions as the court shall determine.'

"This code was drafted by a commission appointed by the governor under Act No. 15, Pub. Acts 1926 (Ex. Sess.), to prepare 'a complete codification of the laws pertaining to crime and criminal court procedure.' Many changes were made in the procedure, the purpose of which was to extend the power of the trial court and to eliminate requirements which in no way prejudiced the rights of the accused. * * *

"The change made by the legislature clearly indicates an intention to vest an even wider discretion in the trial court than that proposed by the commission. This discretion is, of course, reviewable."

We are guided by the rule laid down in *People* v. *Blue, supra,* p. 678:

"Under the code, *the indorsement of names after filing is wholly within the discretion of the court.* The discretion, of course, is judicial, not personal, must be exercised with due regard to protection of the right of an accused to prepare his defense and to be accorded a fair trial, and is to be reviewed upon the showing made and in view of the circumstances. * * * The ultimate question, on review, *is whether the court abused its discretion,* with the burden ordinarily on the party asserting abuse. Want of excuse or bad faith in failing to promptly indorse names does not deprive the court of jurisdiction to permit indorsement but it casts upon the prosecution the burden of demonstrating that defendant will not be injured thereby and that the court is justified in granting the motion."

We are satisfied that defendant McCrea was not prejudiced nor were his rights under the above-quoted statute invaded by the trial court ordering the indorsement of the names of certain witnesses on the information. There was no satisfactory showing that the names of such witnesses were intentionally omitted from the information at the time of filing. The trial court did not abuse its discretion in ordering such indorsement.

The cases of *People* v. *Howes,* 81 Mich. 396, and *People* v. *Hall,* 48 Mich. 482 (42 Am. Rep. 477), and other early cases cited by McCrea, arose and were decided under Act No. 138, § 2, Pub. Acts 1859 (2 Comp. Laws 1871, § 7938), which read:

"All informations shall be filed during term, in the court having jurisdiction of the offense specified therein, by the prosecuting attorney of the proper county as informant; he shall subscribe his name thereto, and indorse thereon the names of the wit-

nesses known to him at the time of filing the same; and at such time *before the trial* of any case as the court may, by rule or otherwise, prescribe, he shall also indorse thereon the names of such other witnesses as shall then be known to him.''

Under such former statute the names of witnesses were required to be indorsed by the prosecution or by the court *''before the trial.''* Under the present statute, 3 Comp. Laws 1929, § 17254, the *''names of other witnesses may be indorsed before or during the trial by leave of the court and upon such conditions as the court shall determine.''* Furthermore, the cases of *People* v. *Hall, supra,* and *People* v. *Howes, supra,* and other early cases were decided prior to the adoption of Act No. 89, Pub. Acts 1915, superseded by Act No. 175, Pub. Acts 1927 (3 Comp. Laws 1929, § 17354 [Stat. Ann. § 28.1096]), which provides that no judgment shall be set aside or reversed or a new trial granted in any criminal case unless it affirmatively appears that the error complained of has resulted in a miscarriage of justice.

There is no merit in McCrea's argument that he was prejudiced by the order of the prosecution's proofs resulting from the alleged failure to indorse certain alleged *res gestae* witnesses on the information at the time of filing. The order of proof was within the discretion of the trial court, and we find no abuse of such discretion. *People* v. *Bigge,* 297 Mich. 58; *People* v. *Rose,* 268 Mich. 529; *People* v. *Kennedy,* 267 Mich. 430; *People* v. *Saunders,* 25 Mich. 119.

The trial court did not commit reversible error in denying McCrea's above-discussed motions to quash the information.

Defendant McCrea next contends that the court erred in denying his motion challenging the array of jurors.

During the impaneling of the jury and after 14 persons had been called to the jury box for examination on *voir dire,* McCrea filed written motion challenging the array for the following reasons: that the list of jurors furnished by the Wayne county board of jury commissioners was not taken from all the qualified electors of Wayne county; that the list of jurors making up the panel and array was taken from a list of registered voters thereby excluding electors who were not registered but had the qualifications of jurors; that the panel and array of jurors was incorrect, improper, and in violation of 3 Comp. Laws 1929, § 13841 (Stat. Ann. § 27.415), and that he was thereby deprived of his rights under the due-process clauses of the State and Federal Constitutions. (Mich. Const. 1908, art. 2, § 16; U. S. Const. am. 14, § 1.) In his affidavit supporting such motion McCrea stated that he had served as assistant prosecuting attorney for eight years, as prosecuting attorney for about three years, as legal adviser for the Wayne county board of jury commissioners, and was "familiar with their methods and procedure for selecting jurors." The court denied such motion challenging the array, and McCrea assigns error.

Section 13841, 3 Comp. Laws 1929, provides, in part:

"The persons whose names shall be returned by said board of jury commissioners shall be suitable to serve as jurors. *They shall have the qualifications of electors* in the town or ward in which they reside and for which they are returned by said board; they shall be persons of good character, of approved integrity, of sound judgment and well informed, conversant with the English language, in possession of their natural faculties, not infirm or decrepit, and otherwise free from all legal exceptions."

The above statute is not mandatory that the names of jurors shall be selected from the entire list of qualified electors in the county. The provision that jurors selected "shall have the qualifications of electors" should not be construed as meaning that jurors shall necessarily be selected only from a list of all the qualified electors. McCrea does not claim that the jurors did not possess the statutory qualifications as jurors. He makes no showing that the jurors selected from the list of registered voters were prejudiced against him or that the jury finally chosen failed to consider the question of his guilt or innocence in a fair and impartial manner. The method used by the board of jury commissioners in selecting the panel of jurors was not in violation of the statute quoted above. McCrea's rights under the due-process clauses of the State and Federal Constitutions were not invaded. The court did not err in denying his motion challenging the array.

Following his conviction McCrea filed motion for new trial alleging, among other things, that the trial court erred in denying his above-discussed motion challenging the array of jurors. He later filed supplemental and also second and third supplemental motions for a new trial, alleging that newly-discovered evidence showed certain other irregularities by the Wayne county jury commission and its secretary in the selection of the panel of jurors. On this appeal he claims error in denying such motion and supplemental motions.

We have concluded, as above stated, that the trial court did not err in denying McCrea's motion challenging the array, which was made during the impaneling of the jury. He bases his supplemental motions, in part, upon alleged newly-discovered evidence as to irregular methods used by the jury commission and its secretary in selecting jurors. As

assistant prosecutor and as prosecuting attorney of the county he was, as stated in his affidavit, familiar with the procedure of the jury commission in selecting jurors. He makes no satisfactory showing that he could not, before the trial, by reasonable diligence, have discovered such alleged irregularities. The law is well established that a challenge to the array, made after a verdict of guilty, comes too late. *People* v. *McArron,* 121 Mich. 1. See, also, *People* v. *Ah Lee Doon,* 97 Cal. 171 (31 Pac. 933); *Davis* v. *State,* 31 Neb. 247 (47 N. W. 854); *Cooley* v. *State,* 174 Tenn. 168 (124 S. W. [2d] 250; *State* v. *Kamuda,* 98 Vt. 466 (129 Atl. 306); *United States* v. *Brookman,* 1 Fed. (2d) 528, affirmed in *Brookman* v. *United States* (C. C. A.), 8 Fed. (2d) 803; *Carruthers* v. *Reed* (C. C. A.), 102 Fed. (2d) 933; certiorari denied, 307 U. S. 643 (59 Sup. Ct. 1047, 83 L. Ed. 1523). Also, 35 C. J. pp. 376-378, § 420; 24 Cyc. pp. 330, 331; 31 Am. Jur. pp. 614, 615, § 80; 3 Wharton's Criminal Procedure (10th Ed.), p. 2005, § 1543; 17 Am. & Eng. Enc. of Law, p. 1114.

In *People* v. *McArron, supra,* 5, we said:

"There is nothing to indicate that the jurors had not the qualifications for jury service, and it appears that, as a fact, they were regularly drawn and summoned. If they were not and the drawing had been irregular, we should think the defect had been waived."

"But the objection is too late * * * after the jury has been impaneled and sworn * * * unless it appears that the irregularity was intentional. * * * If no objection was made at the trial as to the manner of selecting or summoning the jury, it is too late to urge the objection for the first time after verdict, even though the objection was not previously known, unless it appears that the objecting party was prejudiced thereby." 35 C. J. p. 377.

We agree with the trial court who, in denying McCrea's supplemental motion for a new trial and motion challenging the array, said, in part:

"In passing upon the motions, I have taken the position that all of these matters which you called to the attention of the court, outside of what was included in your original affidavit attached to your motion of January 6th, are matters which should have been presented to the court at that time, before the jury was selected, and that the court cannot at this time properly indulge in an inquiry into matters which could or should have been presented to the court as a part of the original motion filed on January 6th."

The trial court did not err in denying McCrea's original motion challenging the array or in denying his motion and supplemental motions for a new trial.

McCrea's claim, in his supplemental motions, that the jury commission selected too many jurors from certain sections and too few from other sections of the county did not warrant the granting of a new trial. *Eberts* v. *Mt. Clemens Sugar Co.,* 182 Mich. 449 (7 N. C. C. A. 52); *People* v. *MacGregor,* 178 Mich. 436; *Smaltz* v. *Boyce,* 109 Mich. 382; *Niles* v. *Schoolcraft Circuit Judge,* 102 Mich. 328; *People* v. *Coffman,* 59 Mich. 1.

McCrea next contends that the trial court erred in requiring him to disclose during the trial that, when called before the grand jury subsequent to his indictment, he stood upon his constitutional rights. Const. 1908, art. 2, § 16.

When questioned as a witness before the grand jury regarding certain of his acts and doings as prosecutor, McCrea had stood upon his constitutional rights and refused to answer, on the ground that his answers might tend to incriminate him. In the trial of the present case he voluntarily took the

witness stand in his own defense. Upon cross-examination the prosecution asked him certain questions which had been propounded to him before the grand jury and which he had there declined to answer. His answers to such cross-examination questions showed no facts which would reasonably tend to incriminate him. The prosecution then read from the transcript of the grand-jury proceedings such questions and McCrea's answers thereto showing that he had stood upon his constitutional rights. He was given the opportunity of examining that part of the transcript containing his grand-jury testimony about which the prosecution was cross-examining him. During such cross-examination regarding his grand-jury testimony, McCrea moved for a mistrial. Such motion was denied.

The prosecution claims that such cross-examination and reading from the transcript of McCrea's grand-jury testimony was proper on the question of the credibility that the trial jury should give to his testimony. In its brief the prosecution states:

"The answers which he (McCrea) gave before the trial jury would not have incriminated him had he given the same before the grand jury; and it became very important as bearing upon his credibility to determine why he stood upon his constitutional rights before the grand jury, inasmuch as the position taken by him before the grand jury was definitely contrary to the position taken and the testimony given before the trial jury.

"We submit that the procedure followed and the questions asked were proper and were important in the determination of the credibility which the jury should give to the testimony of the defendant McCrea."

McCrea claims that the prosecution's cross-examination regarding his grand-jury testimony,

which disclosed that he had stood upon his constitutional rights, was for the purpose of prejudicing him before the trial jury by creating an inference of his guilt and that such procedure violated his constitutional right against self-incrimination. In denying McCrea's motion to strike such cross-examination, the trial court said:

"With reference to the motion which has just been presented, the court recognizes that no man can be compelled to testify against himself. That was true at the time this witness appeared to be sworn before the so-called grand jury. At that time the record shows that in answer to certain questions which were asked of him, that he declined to answer and assigned as his reasons therefor that to do so might incriminate him. In view of the testimony voluntarily given by Mr. McCrea upon this trial when he took the stand voluntarily it thereby became a proper matter of cross-examination for him to explain, if he could, why he claimed before the grand jury that it would incriminate him to answer questions there when upon this hearing he has consistently claimed that he has committed no wrong. If he committed no wrong, then there would be nothing in connection therewith which would incriminate him.

"It is for that reason that the court permitted this examination to be held."

Constitution, 1908, art. 2, § 16, provides:

"No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law."

McCrea was not obliged to take the stand in his own defense. He did so voluntarily and thereby subjected himself to cross-examination, the same as

any other witness. Mr. Justice POTTER in his work on Michigan Evidence, p. 465, states:

"It is proper, on the cross-examination of the accused in criminal cases, to go as fully into his antecedents as it would be with any other witness in the case. He is subject to the same rules of cross-examination as any other witness. *By being sworn in his own behalf he waives his constitutional privilege against self-incriminating questions* material to the case and may be asked on cross-examination any question material to the issue, but it is not competent to ask defendant in a criminal case questions irrelevant to the issue having a tendency to bring in other charges. He may be asked what his conduct in connection with the accusation has been. *Where one testifies, on trial, in his own behalf, it is competent to show that he testified differently elsewhere,* in relation to the same subject."

See, also, *People* v. *Murel,* 225 Mich. 499; *People* v. *Prevost,* 219 Mich. 233; *People* v. *Kimbrough,* 193 Mich 330; *People* v. *Danenberg,* 176 Mich. 337; *People* v. *Bryan,* 170 Mich. 683; *People* v. *Poole,* 159 Mich. 350 (134 Am. St. Rep. 722); *People* v. *Gray,* 135 Mich. 542; *People* v. *Dupounce,* 133 Mich. 1 (103 Am. St. Rep. 435, 2 Ann. Cas. 246); *People* v. *Parmelee,* 112 Mich. 291; *People* v. *Sutherland,* 104 Mich. 468; *People* v. *Bussey,* 82 Mich. 49; *People* v. *Howard,* 73 Mich. 10; 28 R. C. L. p. 444; Underhill's Criminal Evidence (4th Ed.), pp. 201 *et seq.,* § 139; 23 C. J. S. p. 560; 6 Jones' Commentaries on Evidence (2d Ed.), p. 4934, § 2494.

A witness subpoenaed to testify in a criminal trial can stand upon his constitutional right and refuse to answer any questions which might tend to incriminate him. However, a defendant who voluntarily takes the stand in his own defense thereby waives such right and can be subjected to cross-examination

concerning the facts of the case and as affecting his credibility.

The case of *People* v. *Prevost, supra,* did not involve the question of immunity against self-incrimination under the State Constitution. However, our reasoning and conclusions in that case afford guidance on the question of immunity presented in the instant case. In the *Prevost Case* the defendant was tried and convicted of murder. Some time after the murder a John Doe proceedings had been instituted and testimony taken. Such proceedings developed facts which pointed to the defendant as the guilty party. He was arrested and on examination was held for trial and later convicted. At the trial the prosecution presented testimony that defendant had stood upon his statutory privilege and refused to testify in the John Doe proceedings and in his examination after arrest and at the inquest. Defendant's counsel claimed that this was error under 3 Comp. Laws 1915, § 12552 (3 Comp. Laws 1929, § 14218 [Stat. Ann. § 27.913]), which provided, in part:

"*Provided, however,* That a defendant in any criminal case or proceeding shall only at his own request be deemed a competent witness, and his neglect to testify shall not create any presumption against him, nor shall the court permit any reference or comment to be made to or upon such neglect."

In determining this matter we said, p. 237:

"Much time has been devoted to this question and many cases cited, but we are not impressed with the importance of the question, because of the fact that defendant took the stand and testified on the trial in his own behalf. When he did this he waived any benefit which he may have been entitled to under the statute, and was then subject to precisely the same

cross-examination as any other witness. *People* v. *Howard,* 73 Mich. 10; *People* v. *Gray,* 135 Mich. 542; *People* v. *Parmelee,* 112 Mich. 291, 296; *People* v. *Ecarius,* 124 Mich. 616, 623; *People* v. *Higgins,* 127 Mich. 291; *People* v. *Bryan,* 170 Mich. 683; *People* v. *Danenberg,* 176 Mich. 337; *People* v. *Kimbrough,* 193 Mich. 330.

"Upon this question Underhill on Criminal Evidence (2d Ed.), § 68, says:

" 'The exemption from unfavorable comment is applicable only when the accused wholly refrains from testifying. If he voluntarily goes upon the stand, he waives this exemption, and the State may comment upon his testimony as fully as upon that of any other witness, and may call attention to his silence and demeanor while there, or at the preliminary examination, to his refusal to answer incriminating questions; or to deny prominent and damaging facts of which he must have some personal knowledge.' * * *

"The statute was passed for those who do not care to become witnesses in their own behalf and not for those who do. *When a defendant testifies in his own behalf this statute has no application; it is the same as though the statute had never been passed.*"

In *Raffel* v. *United States,* 271 U. S. 494 (46 Sup. Ct. 566, 70 L. Ed. 1054) the defendant, on cross-examination, was required to disclose that he had not testified at his first trial, and to give his reason for not doing so. On appeal to the supreme court of the United States, Mr. Justice Stone said, p. 499:

"The safeguards against self-incrimination are for the benefit of those who do not wish to become witnesses in their own behalf and not for those who do. There is a sound policy in requiring the accused who offers himself as a witness to do so without reservation, as does any other witness. We can discern nothing in the policy of the law against self-incrimination which would require the extension of

immunity to any trial or to any tribunal other than that in which the defendant preserves it by refusing to testify.''

In *Tomlinson* v. *United States,* 68 App. D. C. 106, 110 (93 Fed. [2d] 652, 656, 114 A. L. R. 1315), the court said:

"The privilege of the defendant against self-incrimination and its corollary, the prohibition against comment by counsel for the government upon his failure to testify, have been jealously protected by the courts. But, when the defendant elects, voluntarily, to testify, he waives his privilege, subjects himself to cross-examination and impeachment, and makes comment upon his testimony entirely proper.''

See, also, *United States* v. *Buckner* (C. C. A.), 108 Fed. (2d) 921; certiorari denied, *Buckner* v. *United States,* 309 U. S. 669 (60 Sup. Ct. 613, 84 L. Ed. 1016); *United States* v. *Mortimer* (C. C. A.), 118 Fed. (2d) 266; *United States* v. *Groves* (C. C. A.), 122 Fed. (2d) 87; certiorari denied, 314 U. S. 670 (62 Sup. Ct. 135, 86 L. Ed. 536); *State* v. *Mannion,* 82 N. H. 518 (136 Atl. 358); *Crickmore* v. *State,* 213 Ind. 586 (12 N. E. [2d] 266); *Commonwealth* v. *Galvin,* 310 Mass. 733 (39 N. E. [2d] 656); *Commonwealth* v. *Smith,* 163 Mass. 411 (40 N. E. 189); *Leverett* v. *State,* 18 Ala. App. 578 (93 South. 347); *McKee* v. *People,* 72 Col. 55 (209 Pac. 632); *Taylor* v. *Commonwealth,* 17 Ky. Law, 1214 (34 S. W. 227); Underhill, Criminal Evidence (4th Ed.), p. 219.

The cases of *People* v. *Kiely,* 230 Mich. 403; *Bales* v. *Evans,* 182 Mich. 383; *People* v. *Maunausau,* 60 Mich. 15; *Templeton* v. *People,* 27 Mich. 501, and other authorities cited by McCrea, do not sustain his contention of error. The trial court did not err in permitting the prosecution to cross-examine

McCrea regarding his grand-jury testimony, which disclosed that he had there stood upon his constitutional rights and refused to testify.

We are satisfied that other errors claimed and other questions presented by defendant McCrea do not merit consideration or determination. The many errors assigned must be considered in connection with 3 Comp. Laws 1929, § 17354 (Stat. Ann. § 28.1096), which provides:

"No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this State in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice."

From a careful study of the voluminous record and able briefs we are convinced that there was no error, as to defendant McCrea, which resulted in a miscarriage of justice.

The judgment is affirmed.

Chandler, C. J., and North, Butzel, Bushnell, and Sharpe, JJ., concurred. Boyles and Wiest, JJ., did not sit.